80 F.3d 755
 151 L.R.R.M. (BNA) 3013, 131 Lab.Cas. P 11,546
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
KATZ'S DELICATESSEN OF HOUSTON STREET, INC., d/b/a Katz's
Deli, and Local 131, International Brotherhood of
Trade Unions, Respondents.
 No. 592, Docket 95-4063.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 29, 1995.
Decided April 4, 1996.
 
 Fred L. Cornnell, National Labor Relations Board, Washington, DC (Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Harvard, Supervisory Attorney, Washington, DC, of counsel), for petitioner National Labor Relations Board.
 Joel E. Cohen, New York City (McDermott, Will & Emery, of counsel), for respondent Katz's Delicatessen of Houston Street, Inc., d/b/a Katz's Deli.
 J. Warren Mangan, Long Island City, New York (Linda D. Joseph, O'Connor & Mangan, of counsel), for respondent Local 131, International Brotherhood of Trade Unions.
 Before: ALTIMARI, JACOBS and CABRANES, Circuit Judges.
 JOSE A. CABRANES, Circuit Judge:
 
 
 1
 Our subject is labor relations at Katz's Delicatessen, a landmark rough-and-ready eating establishment on Houston (famously pronounced by generations of New Yorkers as "House-ton") Street, in the northern precincts of the fabled Lower East Side. See THE ENCYCLOPEDIA OF NEW YORK CITY 324 (Kenneth T. Jackson ed., 1995) (referring to Katz's in entry on delicatessens in New York City). It is a legendary site of pilgrimage by, among others, domestic political campaigners and foreign visitors in search of photo opportunities placing them in a New York setting authenticated by the proximity to hot pastrami and stuffed derma. See, e.g., Carey Goldberg, Russian Samples Pastrami Politics, N.Y.TIMES, Feb. 1, 1996, at B3 (reporting visit to Katz's by Vice President Gore and Russian Prime Minister Viktor S. Chernomyrdin).[1] Katz's has also earned a reputation for its contributions to the national defense, having advertised its take-out menu with the "immortal perfect rhyme": "Send a Salami to Your Boy in the Army." See Eugene R. Fidell, Ex-New Yorker ISO CB/RYE, N.Y.L.J., March 25, 1996, at 2.
 
 
 2
 Petitioner, the National Labor Relations Board ("NLRB" or "the Board"), seeks enforcement of an order, 316 N.L.R.B. No. 65 (1995), entered pursuant to subsections 8(a)(1), (2), (3), and (5), and subsections 8(b)(1)(A) and (2), of the National Labor Relations Act ("NLRA" or "the Act"), codified at 29 U.S.C. §§ 151-69, against the respondents Katz's Delicatessen of Houston Street, Inc. ("Katz's") and Local 131, International Brotherhood of Trade Unions ("Local 131"), for various unfair labor practices. The Board found, inter alia, that Katz's violated subsections 8(a)(1) and (5) of the Act by withdrawing recognition from the Hotel Employees & Restaurant Employees International Union, Local 100 ("Local 100") as its employees' collective bargaining representative. It also found that Katz's violated subsections 8(a)(1), (2), and (3)--and that Local 131 violated subsections 8(b)(1)(A) and (2)--by executing a recognition agreement and a collective bargaining agreement containing a union security clause.[2] The Board's order requires Katz's to withdraw recognition from and cease bargaining with Local 131; to recognize and bargain with Local 100; and to restore, upon Local 100's request, the provisions of Local 100's most recent contract with Katz's, including those requiring retroactive payments to Local 100's welfare and pension funds. The order also requires Katz's and Local 131, jointly and severally, to reimburse employees for initiation fees, dues, or other payments made to Local 131 since April 1991. Katz's and Local 131 oppose the Board's application for enforcement of its order on the grounds that the Board's findings and conclusions are contrary to the record evidence and that the remedies ordered are not consistent with the NLRA.
 
 I. FACTS
 
 3
 The following facts of record are drawn primarily from the Administrative Law Judge's Decision of September 2, 1994, affirmed by the Board in a Decision and Order dated February 16, 1995. To the extent that the parties challenge the ALJ's findings, we note their disputes.
 
 
 4
 Two unions, Local 131 and Local 100, claim to have majority support among the employees at Katz's Delicatessen. Local 100 and Katz's have been parties to a series of collective bargaining agreements for many years, the most recent of which was effective from April 1, 1988, to March 30, 1991. Throughout that period, Local 100 was the bargaining representative for Katz's servers, chefs, and kitchen personnel. The most recent collective bargaining agreement required Katz's, among other things, to make contributions to Local 100's pension and welfare funds on behalf of each employee. At all relevant times, Timothy Lynch was the Local 100 business representative assigned to Katz's.
 
 
 5
 In January 1991, Local 131 launched a campaign to replace Local 100 as Katz's collective bargaining agent. By January 30, at least twenty employees had signed authorization cards in support of Local 131's organizing efforts--a majority of Katz's bargaining unit. As a result, Local 131 sought to file an election petition with the NLRB's regional office. However, the NLRB's regional office dismissed the petition as improperly filed. It determined that Local 131 did not file within the thirty-day "open period" (between 60 and 90 days before the expiration of Local 100's contract with Katz's) for the filing of such petitions--thus, barring the filing of Local 131's petition for the next sixty days until the expiration of the contract on March 30, 1991.[3]
 
 A. Negotiations with Local 100
 
 6
 In February and March 1991, Katz's, represented by its attorney, Kenneth Kirschner, as well as co-owners Alan Dell and Fred Austin, and Local 100, represented by its business representative Tim Lynch, held several meetings to negotiate the terms of a new collective bargaining agreement. As of their March 25 meeting, agreement had not been reached on a number of key contract issues, including wages, welfare contributions, and advance notice of visitations by Local 100's business representatives. At that meeting, Katz's representatives stated that they would not be available to meet again until April 9 or 10.
 
 
 7
 B. The Extension Agreement and Local 100's First Employee Petition
 
 
 8
 Although there were no formal negotiations between Katz's and Local 100 after the March 25 session, it is undisputed that on March 30--the day the contract was to expire--Lynch came to Katz's and approached Dell about signing an agreement to extend the contract until April 10. In exchange for signing the extension agreement, Dell obtained concessions from Lynch regarding some of the unresolved wage and benefit terms that would be included in any new contract. Nevertheless, several contract terms remained unresolved.
 
 
 9
 After negotiating the extension agreement, Lynch discussed the contract negotiations with the Katz's employees who were present at the restaurant. Katz's and the NLRB offer very different versions of Lynch's meetings with the employees that day. According to Lynch, he drafted a handwritten document ("employee petition") with the question, "Katz's Deli Contract Ratification Vote: Are you in agreement with the boss's last offer?" written above two columns marked "YES" and "NO." Lynch further testified that he used Spanish-speaking employees as translators and met with small groups of employees, informing them that Katz's and Local 100 had reached a contract agreement that would give the employees better benefits, but that the new contract did not include a pay raise. Lynch also admits telling the employees that Local 100 would call a strike if they did not approve the contract by signing the employee petition. Twenty-two employees signed under the "YES" column, and no one signed under the "NO" column.
 
 
 10
 Several Katz's employees offered a different view of their meeting with Lynch on March 30. They testified that Lynch told them that an agreement had been reached with Katz's, but that he did not tell them any of the terms of the agreement, nor did he present a final offer in writing. Several employees also testified that Lynch presented them with a blank piece of paper to sign or that they did not know what they were signing. According to the employees, Lynch told them that if they did not sign the paper, they would have to go on strike and would lose their jobs and their pensions.
 
 
 11
 C. Local 131's New Election Petition and Local 100's Second Employee Petition
 
 
 12
 On April 2, 1991, after the expiration of Local 100's sixty-day "insulated period," Local 131 again filed an election petition with the NLRB seeking to represent Katz's employees. On April 4, Local 131 sent Katz's a telegram claiming that Local 131 had been designated by Katz's employees as their "majority representative." Katz's co-owner Austin scheduled a meeting for April 11, the day after the expiration of the extension agreement, with a commissioner of the New York State Mediation Board to verify Local 131's majority status by examining the authorization cards Local 131 had collected in January.
 
 
 13
 On April 9, Tim Lynch of Local 100 visited Katz's to secure employee support for Local 100 and to discourage Local 131 from its organizing campaign. Lynch again told the employees that Katz's and Local 100 had reached a contract. According to Lynch, they were instructed that it did not contain a pay raise, that a strike would be called if they did not approve it, that Local 131 would not adequately represent them, and that if the employees selected Local 131, they might lose their pension benefits. Lynch obtained nineteen signatures on a second employee petition stating the following:
 
 
 14
 We, the undersigned members of Local 100 employed at Katz's Delicatessen have approved the recently negotiated contract between Katz Deli and Local 100. This was ratified by a majority of us on Saturday, March 30, 1991.
 
 
 15
 A committee of workers selected by us participated in the negotiation meetings and we were fully informed every step of the way.
 
 
 16
 We are in no way interested in any other labor organization representing us, other than H.E.R.E. Local 100.
 
 
 17
 According to the Katz's employees who testified on behalf of their employer, Lynch never presented them with a written contract, never explained its terms, told them that Local 131 was a "ghost union," and threatened them with loss of their jobs and their pensions if they did not sign in support of Local 100.
 
 D. The NLRB Conference
 
 18
 On April 10, the NLRB held a conference at its regional office to discuss Local 131's election petition. Dell and Kirschner for Katz's, Lynch for Local 100, and attorney Warren Mangan for Local 131 met with Board Agent Polly Chill. After reviewing the extension agreement between Katz's and Local 100, Chill determined that the agreement would not bar an election under the Board's rules. Lynch then presented a copy of Local 100's April 9 employee petition to Mangan, stating that it proved that Local 100, not Local 131, represented a majority of the employees.
 
 
 19
 E. Local 131's Recognition Agreement and Collective Bargaining Agreement
 
 
 20
 The next day, April 11, the New York Mediation Board commissioner determined that Local 131 had obtained twenty valid authorization cards in January 1991. Katz's immediately signed a recognition agreement with Local 131, effectively withdrawing recognition from Local 100. Katz's and Local 131 signed a collective bargaining agreement that was ratified by employees on April 18. This new agreement did not include a provision for a pension plan, but it did require Katz's to make payments to an annuity fund on behalf of its employees. The contract also contained a union security clause that required the deduction of union dues from the employees' paychecks. On April 18, Local 131 requested that the NLRB withdraw its election petition, and by a letter from the Board's Regional Director dated April 22, the Board approved the withdrawal.F. Proceedings before the ALJ
 
 
 21
 In May 1992, more than a year after Katz's had withdrawn recognition from Local 100 and signed an agreement with Local 131, the NLRB's General Counsel issued a consolidated complaint alleging that both Katz's and Local 131 had engaged in various unfair labor practices. Hearings were held before Administrative Law Judge Steven B. Fish in November 1993, and on September 2, 1994, the ALJ issued his factual findings and recommended order.
 
 
 22
 The ALJ found that, contrary to Lynch's assertions, Katz's and Local 100 had not agreed on a new contract during their negotiations in February and March 1991. Based on Lynch's and the Katz's employees' testimony, the ALJ determined that Lynch had informed Katz's employees that a contract had been reached and that the purported contract did not contain a salary increase. He found that Lynch had told Katz's employees that the Local 100 contract would give them better benefits and that they might lose their pension benefits if they went with Local 131. The ALJ did not credit the testimony by Katz's employees that Lynch threatened they would lose their jobs if they refused to sign Local 100's employee petitions.
 
 
 23
 Based on these findings of fact, the ALJ concluded that Katz's had violated sections 8(a)(1) and (5) of the NLRA by withdrawing recognition from Local 100. He noted that the authorization cards signed by Katz's employees in support of Local 131 in January 1991 could not be used to establish Local 131's majority support in light of Local 100's March 30, 1991, and April 9, 1991, employee petitions (signed by 19 of 34 Katz's employees and at least 18 of the same Katz's employees who signed Local 131's cards). Furthermore, the ALJ noted that Katz's could not have had a good faith doubt of Local 100's majority status, because Katz's was aware of Local 100's April 9 employee petition at the NLRB regional office conference of April 10--the day before Katz's signed the recognition agreement with Local 131. The ALJ noted that Katz's lack of good faith was further demonstrated by its immediate entry into a recognition agreement and contract with Local 131. Accordingly, the ALJ found that Katz's had withdrawn recognition from Local 100 while it was aware of Local 100's continued employee support.
 
 
 24
 The ALJ also concluded that Katz's violated subsections 8(a)(1), (2), and (3) of the Act and that Local 131 violated subsections 8(b)(1)(A) and (2) of the Act by executing the recognition agreement and the collective-bargaining agreement, which contained a union security clause. This conclusion was based on two independent theories: (1) the agreements were unlawful because Local 131 did not have majority support among Katz's employees, and (2) Katz's and Local 131 signed a recognition agreement and contract while a "question concerning representation" existed--that is, while Local 131 had an election petition on file with the NLRB. In so finding, the ALJ rejected Katz's and Local 131's attempts to discredit Local 100's employee petitions on the ground that Local 100 had coerced or deceived Katz's employees by threatening them with a loss of their pensions or other benefits if they did not sign.
 
 
 25
 As a remedy for the violations found, the ALJ recommended that Katz's and Local 131 be ordered, inter alia, to cease and desist from the unfair labor practices found. Furthermore, he recommended that Katz's be ordered to withdraw recognition from Local 131 and to recognize and bargain with Local 100. As a remedy for its unlawful withdrawal of recognition from Local 100, the ALJ recommended that Katz's be required to retroactively restore, upon Local 100's request, the provisions set forth in Local 100's most recent contract with Katz's, including the provisions requiring payments to Local 100's welfare and pension funds, in order "to place Katz's employees in the same position that they would have been in, had [Katz's] not unlawfully withdrawn recognition [from Local 100]." As an additional remedy for Katz's and Local 131's improper entry into a recognition agreement and contract, the ALJ recommended that Katz's and Local 131 be ordered jointly and severally to reimburse Katz's employees for initiation fees, dues, or other payments made to Local 131 during that period.[4]
 
 G. The NLRB's Decision
 
 26
 Katz's and Local 131 filed exceptions to the ALJ's rulings, findings, and conclusions with the NLRB on October 21, 1994. After considering the issues raised, a three-member panel of the NLRB issued a Decision and Order on February 16, 1995, adopting the ALJ's recommended order in full.[5] In so doing, the Board considered and rejected Katz's and Local 131's exceptions to the ALJ's credibility findings--specifically, his reliance on Local 100's March 30 and April 9 employee petitions as indicators of support for Local 100 and his failure to find that those petitions were invalid because of Local 100's alleged coercion and deception.
 
 
 27
 Katz's and Local 131 both challenge the NLRB's Decision and Order, arguing (1) the violations found are not supported by substantial evidence and accordingly cannot be enforced; and (2) even if the Board properly found that Katz's and Local 131's conduct violated the NLRA, the orders directing reimbursement of employees for fees and dues paid to Local 131 and retroactive payments into Local 100's welfare and pension funds are improper.
 
 
 28
 We grant the Board's petition for enforcement in its entirety, and remand for compliance proceedings in accordance with this opinion.
 
 II. DISCUSSION
 
 29
 A. Relevant Statutes and Standards of Review
 
 
 30
 Katz's and Local 131 argue that the Board adopted the ALJ's erroneous evaluation of the evidence and that the record does not support its Decision and Order concluding that they committed unfair labor practices. Our review of Board orders is quite limited. We must enforce the Board's order where its legal conclusions are reasonably based, and its factual findings are supported by substantial evidence on the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464-65, 95 L.Ed. 456 (1951); see also NLRB v. Windsor Castle Health Care Facilities, Inc., 13 F.3d 619, 623 (2d Cir.1994). We have previously interpreted this to mean that "reversal based upon a factual question will only be warranted if, after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusion drawn by the Board." NLRB v. Albany Steel, Inc., 17 F.3d 564, 568 (2d Cir.1994) (internal quotation marks and alterations omitted). Our role in reviewing credibility determinations of an ALJ, affirmed by the Board, is even further constricted, inasmuch as they may not be disturbed unless incredible or flatly contradicted by undisputed documentary testimony. NLRB v. S.E. Nichols, Inc., 862 F.2d 952, 956 (2d Cir.1988), cert. denied, 490 U.S. 1108, 109 S.Ct. 3162, 104 L.Ed.2d 1025 (1989).
 
 
 31
 B. Violations of Subsections 8(a)(1) and (5) of the NLRA: Unlawful Withdrawal of Recognition
 
 
 32
 Subsection 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), proscribes as an unfair labor practice any action taken by an employer "to interfere with, restrain, or coerce employees in the exercise of [their] rights" to choose their bargaining representatives. Subsection 8(a)(5) makes it an unfair labor practice for an employer to refuse to bargain with the union chosen by its employees as their collective bargaining agent.[6] The Board found that Katz's violated both of these provisions when it withdrew recognition from Local 100 and ceased bargaining with that union as its employees' agent.
 
 
 33
 As a preliminary matter, we reject Katz's argument that it was denied due process of law because the NLRB's complaint did not specifically allege that Katz's withdrawal of recognition from Local 100 was unlawful. In NLRB v. Coca-Cola Bottling Co. of Buffalo, Inc., 811 F.2d 82, 87 (2d Cir.1987), we held that the NLRB may find an "uncharged" violation "if all issues surrounding the violation have been litigated fully and fairly." While the complaint alleged that Katz's illegally recognized and bargained with Local 131, Katz's claims that it did not charge improper withdrawal of recognition from Local 100.[7] These are indeed two separate unfair labor practices, but in this case they both hinge on the question of whether the fact-finder credits Local 100's March 30 and April 9 employee petitions (and the testimonial evidence in support of those petitions) as demonstrating support for that union--a question that was fully litigated before the ALJ. If the employee petitions are properly considered a valid indication of majority support for Local 100, then Katz's unlawfully withdrew recognition from Local 100 and unlawfully recognized and negotiated with Local 131. Furthermore, Katz's attorneys argued explicitly before the ALJ that Katz's was entitled to withdraw recognition from Local 100:
 
 
 34
 I believe that as a practical matter, Local 131 did represent a majority ... and therefore that the employer had a good faith [doubt] as to the continued majority status of Local 100 based on what was presented by Local 131, and that therefore the withdrawal of recognition from Local 100 was certainly proper.
 
 
 35
 Accordingly, we find no due process violation.
 
 
 36
 Upon the expiration of a collective bargaining agreement, an incumbent union is entitled to a rebuttable presumption of continued majority status. NLRB v. Koenig Iron Works, Inc., 681 F.2d 130, 137 (2d Cir.1982). With such a presumption in place, an employer may not withdraw recognition from or refuse to bargain with the incumbent union. Nevertheless, an employer may rebut the presumption and withdraw recognition from an incumbent union by introducing objective evidence that (1) the incumbent union has in fact lost its majority support, or (2) the employer's withdrawal was founded on a reasonably based "good faith doubt" of the union's continued majority status. Id. The employer has the burden of producing "clear and convincing evidence of loss of union support"; or under the "good faith doubt" alternative, it "must come forward with easily verifiable and unambiguous evidence supporting [its] belief that [its] employees have rejected the incumbent union as a bargaining agent." Id. As noted above, the sufficiency of evidence is a factual question subject to limited review.
 
 
 37
 Upon hearing the testimony and reviewing the documentary evidence, the ALJ concluded that Katz's unlawfully withdrew recognition from Local 100. First, he found that the March 30 and April 9 employee petitions signed by a majority of Katz's employees were valid showings of support for Local 100; therefore, it had not lost its majority status. Second, he determined that Katz's failed to demonstrate its reasonably-based good faith doubt of Local 100's majority status. He found that at the time Katz's recognized Local 131 (and effectively withdrew recognition from Local 100) on April 11, Katz's co-owner, Dell, knew--at the very least--about the April 9 employee petition, because Local 100 had presented it at the NLRB conference on April 10. Indeed, the ALJ found that Dell acknowledged the existence and validity of the April 9 petition at that meeting, "conced[ing] that the document proved that Local 100 represented a majority of the workers." In spite of this knowledge, Katz's withdrew recognition from Local 100 and recognized Local 131 as its employees' bargaining agent on April 11. The ALJ's findings were affirmed in their entirety by the NLRB after its review of the record.
 
 
 38
 Katz's argues that Local 100's March 30 and April 9 employee petitions are invalid in light of "the fraudulent and coercive means by which Local 100 obtained the signatures," and therefore, the authorization cards signed by Katz's employees in support of Local 131 in January 1991 clearly prove that Local 100 had lost its majority support. In so contending, Katz's takes issue with the ALJ's credibility determinations and factual findings. We must affirm such findings unless, after reviewing the record as a whole, we conclude that no rational trier of fact could reach the same conclusion. Albany Steel, 17 F.3d at 568.
 
 
 39
 First, Katz's argues that in finding Local 100's employee petitions to be valid, the ALJ and the Board ignored the testimony by Katz's employees that Lynch had actually given the employees a blank piece of paper to sign and added the headings later. We reject this argument out of hand. The Board specifically found that the ALJ did not ignore that testimony, but rather that he "implicitly discredited" it. Such implicit credibility resolutions are appropriate where an ALJ's treatment of the evidence is supported by the record as a whole. NLRB v. Berger Transfer & Storage Co., 678 F.2d 679, 687 (7th Cir.1982); see Abbey's Transp. Services, Inc. v. NLRB, 837 F.2d 575, 580 (2d Cir.1988) (finding that ALJ "obviously discredited" a witness where he did not do so explicitly); cf. Marlowe v. Bottarelli, 938 F.2d 807, 813 (7th Cir.1991) (deferring to district court's implicit credibility resolution in context of employment discrimination suit); Lavernia v. Lynaugh, 845 F.2d 493, 500 (5th Cir.1988) ("When ... a trial court fails to render express findings on credibility but makes a ruling that depends upon an implicit determination that credits one witness's testimony as being truthful, or implicitly discredits another's, such determinations are entitled to the same presumption of correctness that they would have been accorded had they been made explicitly."). In the instant case, the ALJ clearly noted that his findings were based on "[his] examination of the entire record, [his] observation of the witnesses' demeanor while testifying, and [his] evaluation of the reliability of their testimony." Furthermore, he explicitly stated that "any testimony which is inconsistent with or contrary to my findings is discredited."
 
 
 40
 Second, Katz's contends that insofar as the ALJ and the Board found that Local 100's employee petitions falsely stated that there was a contract between Katz's and Local 100, it was improper for them to rely on the petitions as a valid showing of support for Local 100. In other words, Katz's argues that because the ALJ and the Board did not credit Lynch's testimony that a final agreement had been reached and determined that the employee petitions contained false representations to that effect, the petitions could not reasonably be credited as indications of employee support for the union. There is no question that in determining that a final contract had not been reached between Katz's and Local 100, the Board credited Dell's testimony over Lynch's. However, the ALJ and the Board believed Lynch's testimony that he and Katz's had reached agreement on certain contract items and that he gave the employees some information about the terms agreed upon.
 
 
 41
 The question presented is whether there is substantial evidence on the record to support the Board's determinations with respect to the employee petitions; that is, is it possible for a rational trier of fact to find both that (i) the two Local 100 petitions signed by Katz's employees falsely stated that Katz's and Local 100 had agreed to a contract and (ii) the two employee petitions nevertheless represented a valid showing of employee support for Local 100? While the ALJ's findings concerning the employee petitions may seem surprising, they are not unsupported by the record. Even though the ALJ found that the petitions contained false information and were signed at least partially in response to Lynch's inaccurate statements about the status of contract negotiations, those findings did not require him to disregard the petitions as evidence of employee support for Local 100. We regard it as significant that the ALJ explicitly found that, despite the fact that Lynch told the employees that the alleged contract would give them no salary increase, the employees signed the April 9 petition indicating that they were "in no way interested in any other labor organization representing [them] other than H.E.R.E. Local 100." Even if the employee petition inaccurately stated that a contract between Katz's and Local 100 existed, it is notable that the employees signed it knowing little more about that contract than the fact that it did not include a wage increase. Under these circumstances, it was not unreasonable for the ALJ to draw the inference that the employees signed the petitions because of their underlying support for the union, not because of the financial terms offered by the putative agreement. We cannot find that the ALJ's decision (affirmed by the NLRB) to credit the employee petitions as evidence of majority support for Local 100 was "incredible or flatly contradicted by undisputed documentary testimony." S.E. Nichols, Inc., 862 F.2d at 958.[8]
 
 
 42
 Third, Katz's argues that the ALJ, and in turn, the Board, should not have credited the employee petitions because Lynch coerced employees to sign them by threatening them with the possibility of a strike and/or a loss of benefits if they refused. The ALJ found that in urging employees to sign the petitions, Lynch told them that a contract negotiated by Local 100 would provide them with better benefits, and if they chose a "ghost union" like Local 131, they either could or would lose their pension and other benefits. After hearing the testimony and carefully weighing those statements, the ALJ reasonably found that they did not constitute coercive labor tactics, but were "essentially accurate" arguments comparing Local 100 and Local 131 and explaining "why [the employees] should continue to support Local 100 rather than switch to another labor organization." All of these findings were affirmed by the Board.
 
 
 43
 The instant case is readily distinguishable from 299 Lincoln Street, Inc., 292 N.L.R.B. 172, 172-74 (1988), and Mississippi Chemical Corp., 280 N.L.R.B. 413, 417, 422 (1986), inasmuch as the employers in those cases were not comparing two competing plans or programs, but rather, were directly threatening employees with a retaliatory loss of benefits on account of their involvement in protected union activities. Also, contrary to Katz's assertions, the ALJ and the Board did not find that Lynch told Katz's employees that they would be compelled to strike against their will if they did not sign the petitions; it only found that Lynch made the lawful statement that a strike would be called by the Union if the alleged contract was not ratified. Because we conclude that a rational trier of fact could have made such a finding based on the record presented, we will not disturb the Board's determination.
 
 
 44
 Accordingly, we find that the ALJ and the Board were entitled to credit the March 30 and April 9 employee petitions as valid indications of majority support for Local 100, analogous to the union authorization cards signed by Katz's employees in support of Local 131 in January 1991. As the Board properly found, it was faced with circumstances akin to a "dual card" situation. In "dual card" cases, the Board may not count toward the majority status of either union any authorization card signed by an employee who has signed cards for both unions, unless the evidence "clearly dissipate[s] the ambivalence" surrounding the signer's intent and leaves no doubt that the signer intended only one of his dual cards to indicate his support. Crest Containers Corp., 223 N.L.R.B. 739, 741 (1976). Out of the twenty employees of Katz's who signed cards for Local 131 in January, eighteen also signed at least one of the employee petitions for Local 100. At the very least, Local 131's authorization cards were rendered ambiguous (if not a nullity) by Local 100's employee petitions. The Board reasonably found that, given the absence of evidence that a majority of Katz's employees intended to give their support solely to Local 131, Local 100's employee petitions nullified Local 131's cards and precluded Katz's from relying on them to rebut Local 100's presumption of majority status.
 
 
 45
 Katz's argues that even if Local 100 did not actually lose its majority status, Local 131's authorization cards created a sufficient basis for Katz's to have a reasonable good faith doubt as to Local 100's status. We simply see no basis for disturbing the Board's finding that at the time Dell acted to withdraw recognition from Local 100, he knew of the existence of Local 100's April 9 employee petition and "that the document proved that Local 100 represented a majority of the workers" at the time Katz's withdrew recognition from that union. Accordingly, we affirm the decision below finding Katz's in violation of subsections 8(a)(1) and (5).
 
 
 46
 C. Violations of Subsections 8(a)(1), (2), (3), and Subsections 8(b)(1)(A) and (2): Unlawful Recognition and Entry into a Collective Bargaining Agreement
 
 
 47
 Subsection 8(a)(2) of the NLRA, 29 U.S.C. § 158(a)(2), makes it an unfair labor practice for an employer to recognize and enter a collective bargaining agreement with a union that has not been selected by a majority of the employees in the bargaining unit, regardless of whether the employer believes in good faith that the union has majority support.[9] Int'l Ladies' Garment Workers' Union v. NLRB, 366 U.S. 731, 739, 81 S.Ct. 1603, 1608, 6 L.Ed.2d 762 (1961) ("The act made unlawful by § 8(a)(2) is employer support of a minority union.... [P]rohibited conduct cannot be excused by a showing of good faith."). Similarly, § 8(b)(1)(A), 29 U.S.C. § 158(b)(1)(A), makes it an unfair labor practice for a union without majority support to accept an employer's recognition.[10] Windsor Castle Health Care, 13 F.3d at 622. When an employer and a minority union include a union security clause in their contract, the employer violates § 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3), and the union violates § 8(b)(2), 29 U.S.C. § 158(b)(2). Int'l Union of Petroleum & Indus. Workers v. NLRB, 980 F.2d 774, 778 (D.C.Cir.1992) (citing Local Lodge No. 1424 v. NLRB, 362 U.S. 411, 412-14, 80 S.Ct. 822, 824-25, 4 L.Ed.2d 832 (1960)).
 
 
 48
 The NLRB found that Katz's entry into a recognition agreement and a collective bargaining agreement with Local 131 violated the NLRA under two independent theories: (1) because circumstances akin to a dual card situation existed, Local 131 did not have majority support at the time Katz's recognized it as its employees' bargaining agent; and (2) Katz's and Local 131 could not enter a recognition agreement or a collective bargaining agreement while Local 131 had a representation petition pending with the NLRB for a Board-certified election.
 
 1. Dual Cards
 
 49
 In contesting the Board's finding that they unlawfully signed a recognition agreement and a collective bargaining agreement, Katz's and Local 131 make the identical argument that Katz's made in challenging the Board's finding that it unlawfully withdrew recognition from Local 100: because Local 100 used "fraudulent and coercive" means to obtain signatures from Katz's employees, the March 30 and April 9 employee petitions cannot be counted towards majority support for Local 100. Accordingly, they claim that the April 11, 1991, count of Local 131's authorization cards "provided a valid and reasonable basis for Katz's good faith belief that it was proper to recognize and bargain with Local 131."
 
 
 50
 Under the NLRA, an employer may recognize a union as its exclusive collective bargaining agent only if that union enjoys the support of a majority of the employees. Local 144 v. NLRB, 9 F.3d 218, 223 (2d Cir.1993); see 29 U.S.C. §§ 159(a), 158(a)(2). As discussed above, the ALJ reasonably found that Local 100's employee petitions represented a valid showing of support for that union and created a "dual card" situation. All duplicate signatures were properly disregarded by the ALJ, and accordingly, he found that Local 131 lacked majority employee support. Inasmuch as Local 131 did not have the unambiguous support of a majority of Katz's employees, Katz's and Local 131 unlawfully entered into a recognition agreement and a collective bargaining agreement. Because "[t]he employer's knowledge or ignorance of the union's minority status is irrelevant to the question [of] whether the recognition constitutes an unfair labor practice," Human Development Ass'n v. NLRB, 937 F.2d 657, 665 (D.C.Cir.1991), cert. denied, 503 U.S. 950, 112 S.Ct. 1512, 117 L.Ed.2d 649 (1992), we need not consider Katz's "good faith" argument.
 
 2. Pending Representation Petition
 
 51
 The NLRA forbids an employer from recognizing a union while a genuine "question concerning representation" ("QCR") exists regarding whether that union or a rival represents a majority of its employees. Human Development Ass'n, 937 F.2d at 666; American Can Co. v. NLRB, 535 F.2d 180, 185-86 (2d Cir.1976); Midwest Piping and Supply Company, 63 N.L.R.B. 1060 (1945). The Board has long held that the filing of an election petition with the NLRB raises a QCR, mandating strict employer neutrality with respect to the unions competing to represent its employees. See Bruckner Nursing Home, 262 N.L.R.B. 955, 957 (1982) ("[O]nce notified of a valid [election] petition, an employer must refrain from recognizing any of the rival unions."). A valid representation petition is one which has the support of least 30% of the employees in the relevant bargaining unit. 29 C.F.R. § 101.18(a).
 
 
 52
 In RCA Del Caribe, Inc., 262 N.L.R.B. 963, 965, 1982 WL 24672 (1982), the Board discussed how the rule of strict employer neutrality applied in circumstances where a rival union filed an election petition challenging an incumbent's status as a majority representative. It held that because the incumbent maintains a presumption of majority status "the mere filing of a representation petition by an outside, challenging union [will not] require or permit an employer to withdraw from bargaining or executing a contract with an incumbent union." Id. (emphasis added). The Board reasoned that in light of the existing relationship between the employer and the incumbent union, the employer could not maintain the neutral posture required by Midwest Piping by ceasing negotiations because a refusal to bargain with the incumbent could easily be viewed as giving an advantage to the rival union. However, this did not alter the Midwest Piping and Bruckner rules forbidding an employer from recognizing and bargaining with a rival union whose petition for representation remains on file with the Board. Id; see Bruckner, 262 N.L.R.B. at 957; see also Haddon House Food Products, Inc. v. NLRB, 764 F.2d 182, 186 (3d Cir.1985), cert. denied, 475 U.S. 1011, 106 S.Ct. 1187, 89 L.Ed.2d 303 (1986). This policy of employer neutrality with respect to a rival union is rooted in the Board's concern for maintaining stability in labor relations and preserving the integrity of the election process during a potentially disruptive period. The incumbent union need not demonstrate its continued majority support before a violation can be charged for an employer's recognition of a rival union. The incumbent must only maintain its claim to be the representative of the unit's employees. See Signal Transformer Co., 265 N.L.R.B. 272, 281 (1982).
 
 
 53
 Katz's and Local 131 clearly violated this rule. Neither party disputes the following facts: On April 2, 1991, after the expiration of Local 100's sixty-day "insulated period," Local 131 filed an election petition with the NLRB seeking to represent Katz's employees. Katz's was aware of Local 131's election petition, and indeed, Dell and Kirschner attended a conference on that petition at the NLRB's regional office on April 10. Nevertheless, Katz's and Local 131 signed a recognition agreement on April 11 and subsequently reached a collective bargaining agreement containing a union-security clause, which was ratified by the employees on April 18. On April 18, pursuant to 29 C.F.R. § 101.18(b),[11] Local 131 requested that the NLRB withdraw its election petition, and the NLRB approved its withdrawal on April 22.
 
 
 54
 Katz's and Local 131 assail the Board's finding of a violation for their signing of the recognition and collective bargaining agreements as a "technical" application of the "petition-pending" rule that should not apply to them because the parties were aware that Local 131 intended to withdraw the election petition (and it was in fact withdrawn) within several days of signing the agreements. This argument runs counter to the sound view that (as the Board noted in its opinion adopting the findings of the ALJ) Midwest Piping created a "clearly defined rule of conduct" designed to give a "preference for a Board-conducted election in the face of competing claims." This clearly defined rule is not altered merely because the parties contemplated withdrawing the election petition or because they ultimately did so after signing the recognition agreement.
 
 
 55
 Insofar as we find that Local 100's conduct did not amount to an unfair labor practice, see supra at 765-66, we need not address Katz's argument that Local 100 lost its incumbent status and its continuing claim to represent Katz's employees based on its commission of such alleged practices. We affirm the decision below finding Katz's and Local 131 in violation of subsections 8(a)(1), (2), and (3), and 8(b)(1)(A) and 8(b)(2), respectively.
 
 D. Remedies
 
 56
 Katz's and Local 131 both challenge various remedial provisions in the Board's order. The NLRB has broad discretion in such matters and its choice of remedies is subject to limited review. NLRB v. Browne, 890 F.2d 605, 607 (2d Cir.1989). We will not disturb a remedial order "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943).
 
 1. Dues and Fees
 
 57
 First, Local 131 contends that the Board erred in requiring Katz's and Local 131 jointly and severally to reimburse all Katz's employees who did not voluntarily sign authorization cards for Local 131 prior to the execution of the collective bargaining agreement--that is, all employees who were required to join Local 131 by virtue of the union security clause in Local 131's contract with Katz's--for dues and fees paid. According to Local 131, such an order violates the rule requiring NLRB orders to be remedial, not punitive, because it purports to compensate employees for dues and fees paid without regard for the representation provided for them by Local 131 over the past five years.
 
 
 58
 Where the Board finds that a party has committed an unfair labor practice, section 10(c) of the NLRA permits it to order that party "to cease and desist from such unfair labor practice, and to take such affirmative action ... as will effectuate the policies" of the Act. 29 U.S.C. § 160(c). We have previously held that the policies of the Act are "essentially remedial," and as such, "must compensate for the injury actually suffered by the employees." Manhattan Eye Ear & Throat Hosp. v. NLRB, 942 F.2d 151, 156-57 (2d Cir.1991). In the instant case, the injury suffered by the relevant group of employees (those who did not sign authorization cards and paid dues to Local 131 only by virtue of the union security clause) was their coerced payment of dues and fees to an unlawfully recognized union as a result of an unlawful union-security clause.
 
 
 59
 While we are mindful of the fact that even those employees who joined Local 131 solely as a consequence of the security clause received some benefit from Local 131's representation and negotiation on their behalf, we do not find the Board's order requiring reimbursement of those employees to be punitive or "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric & Power Co., 319 U.S. at 540, 63 S.Ct. at 1218. The relevant question is not whether these employees received some benefit from Local 131's representation in exchange for their dues and fees, but whether they should be reimbursed in light of the fact that they were compelled to make those payments when they might have preferred representation by Local 100 or indeed, no union at all. We held in Local 144 v. NLRB, 9 F.3d at 225, that the NLRB did not abuse its discretion in ordering that employees be reimbursed for dues and initiation fees paid where their employer unlawfully recognized another union as its employees' collective bargaining agent. See also Haddon House Food Prods., 764 F.2d at 185, 188 (holding that Board remedy ordering employer and union to reimburse employees for fees and dues paid pursuant to unlawful union-security clause was not an abuse of discretion and was "particularly appropriate for restoration of a climate of neutrality"); Cascade General v. NLRB, 9 F.3d 731, 737 (9th Cir.1993) (finding that Board's order requiring employer to reimburse employees who did not freely choose union for fees and dues "promotes the policies of the [NLRA] by assisting in completely disestablishing the illegally constituted union, severing its connection with the employer, restoring freedom of choice to the employee, and encouraging the employee to exercise his rights under the Act") (citations omitted), cert. denied, --- U.S. ----, 114 S.Ct. 1610, 128 L.Ed.2d 338 (1994); cf. Cascade General, 9 F.3d at 739-40 (Rymer, J., concurring in part and dissenting in part) (arguing that such an order is punitive where it is directed solely against an employer and there is no evidence in the record of the employer's "knowingly culpable conduct"). Thus, we affirm the Board's order requiring that Katz's and Local 131 jointly and severally reimburse all unit employees, except those who joined or signed authorization cards for Local 131 prior to the execution of the collective-bargaining agreement between Katz and Local 131 on April 18, 1991, for initiation fees, dues, or other obligations of membership in Local 131, plus interest.
 
 
 60
 Since Katz's should never have recognized Local 131, much less entered a collective bargaining agreement containing a union security clause with that union, it was entirely within the Board's remedial authority to order reimbursement of dues and fees.
 
 
 61
 2. Payments to Local 100's Welfare and Pension Funds
 
 
 62
 Katz's challenges the NLRB's order requiring it to make retroactive payments into Local 100's welfare and pension funds. The Board's order specifically requires Katz's to
 
 
 63
 rescind any departures from terms and conditions of employment that existed prior to April 11, 1991, retroactively restoring preexisting terms and conditions of employment of employees as set forth in the remedy section of this decision.
 
 
 64
 The remedy section of the decision makes repeated references to Katz's duty to "restor[e] the status quo, by placing the employees in the same position that they would have been in, had [Katz's] not unlawfully withdrawn recognition [from Local 100]" and notes that it must "restore its employees' terms and conditions of employment to its prior status ... including, but not limited to payments into the Local 100 funds."
 
 
 65
 Katz's objects to the order, arguing that it is punitive because Katz's employees have been adequately compensated by Katz's contributions to Local 131's welfare and annuity funds since April 1991, pursuant to Katz's collective bargaining agreement with Local 131, and that ordering retroactive payment to Local 100's welfare and pension funds for the same period would give a windfall to that union without benefitting the employees. In so arguing, Katz's relies on Manhattan Eye, 942 F.2d at 157, in which we refused to enforce a Board order requiring an employer to make back payments to the union's health and pension funds as a remedy for the employer's unfair labor practices because the employer had compensated the employees with substitute benefit plans during the relevant period. In rejecting the Board's order in that case, we held that enforcement of such an order, under the circumstances there presented, "fail[ed] to benefit the employees, [was] unduly harsh on the employer, and result[ed] in a windfall for the union funds." Id. at 159-60.
 
 
 66
 We find Katz's appeal of this matter to be premature inasmuch as the Board's Decision and Order is not necessarily inconsistent with our opinion in Manhattan Eye. On its face, the order merely requires that Katz's make retroactive payments to Local 100's pension and welfare funds so as to "plac[e] [its] employees in the same position that they would have been in, had [Katz's] not unlawfully withdrawn recognition." The Board has yet to determine how Katz's payments should be structured to best achieve that result, because there has been no compliance proceeding in this case. Compliance determinations are routinely made "after entry of a Board order directing remedial action, or the entry of a court judgment enforcing such [an] order." 29 C.F.R. § 102.52. Formal proceedings, including a hearing before an ALJ, are instituted when it is necessary to resolve compliance issues. Id. § 102.54. We have previously likened NLRB compliance proceedings "to the damages phase of a civil proceeding." Coca-Cola Bottling Co. of Buffalo, 55 F.3d at 77. Indeed, Manhattan Eye was decided only after the NLRB had conducted compliance proceedings, interpreting a similar Board order, requiring the employer to
 
 
 67
 restore the terms and conditions of employment in existence prior to the unlawful ... changes and make whole the employees for any losses suffered by reason of the unlawful unilateral changes and make contributions to the [funds], if any, which would have been made but for the [employer's] unilateral institution of the pension, health, and insurance plans.
 
 
 68
 942 F.2d at 154.
 
 
 69
 Compliance proceedings are particularly necessary in cases such as this, where there is insufficient evidence on the record to determine how best to restore Katz's employees to the position they would have otherwise occupied. With regard to the two unions' welfare funds, we are unable to determine how the plans compare and to what extent employees may have been denied benefits under the Local 131 plan that they would have received under the Local 100 plan. Similarly, on the current record, we have no way of knowing (1) how Local 100's pension fund compares to Local 131's annuity fund; (2) whether and to what extent Katz's employees had individual pension accounts with Local 100 that suffered losses or whether they otherwise lost their pension contributions when Katz's shifted its employees to Local 131's plan; and (3) whether and to what extent the money paid by Katz's on behalf of its employees into Local 131's annuity fund since April 1991 can be transferred into Local 100's pension fund.
 
 
 70
 Only after such determinations have been made can we evaluate whether the Board's remedial order is consistent with Manhattan Eye--ordering retroactive benefit payments only to the extent necessary to restore Katz's employees to the position they would have been in had Katz's not withdrawn recognition from Local 100 and recognized Local 131. The NLRB should be given the opportunity, in the first instance, to apply Manhattan Eye to this case.
 
 
 71
 We therefore remand this case to the NLRB, with instructions to initiate formal compliance proceedings in accordance with 29 C.F.R. § 102.54 to resolve the remaining questions. In so doing, we again emphasize that the compliance proceedings should aim to restore Katz's individual employees to the position they would have occupied had Katz's not violated the NLRA, without creating a windfall for Local 100.
 
 
 72
 In closing, we note that the NLRB's order does not make Local 100 the permanent collective bargaining representative for Katz's employees. In keeping with the NLRA's motivating principles of "freedom of association, self-organization, and designation of representatives of [employees'] own choosing," 29 U.S.C. § 151, the order merely requires that Katz's bargain in good faith with Local 100. Even if an agreement is reached, the employees can refuse to ratify it and they can call for an election if they desire a different union to serve as their collective bargaining agent. Similarly, even after a collective bargaining agreement is signed, they remain free to petition for decertification if they are dissatisfied with Local 100's representation. See 29 C.F.R. § 101.17.
 
 III. CONCLUSION
 
 73
 To summarize: We grant the NLRB's petition for enforcement of its order against Katz's and Local 131, on the grounds that the ALJ reasonably found
 
 
 74
 (a) that Local 100's employee petitions constituted valid evidence of majority support for that union;
 
 
 75
 (b) that Katz's did not have a reasonable good faith doubt as to Local 100's majority status;
 
 
 76
 (c) that Local 131 did not have majority support; and
 
 
 77
 (d) that Katz's and Local 131 entered into a recognition agreement and collective bargaining agreement while Local 131 had an election petition on file with the NLRB.
 
 
 78
 Accordingly, we affirm the Board's conclusion that Katz's violated subsections 8(a)(1) and (5) of the NLRA in withdrawing recognition from Local 100, and that Katz's and Local 131 violated subsections 8(a)(1), (2), and (3), and subsections 8(b)(1)(A) and (2), respectively, in signing a recognition agreement and collective bargaining agreement.
 
 
 79
 We remand the cause to the NLRB with instructions to initiate compliance proceedings in accordance with this opinion.
 
 
 
 [1]
 See also Robert Gearty, Pols Pass Mustard, N.Y. DAILY NEWS, Feb. 1, 1996, at 14 (reporting the response of Katz's co-owner Fred Austin to visit by Gore and Chernomyrdin: "We'll treat them rudely like we treat everybody else.... It's part of the New York ethos"); id., (reporting Austin's response to question about relations between the United States and Russia as follows: "I hope the two countries do good things.... What do you want me to say? I own a deli.")
 
 
 [2]
 The Board also found that Katz's violated subsections 8(a)(1), (2), and (3) of the Act by threatening and discharging employee and Local 100 supporter David Kindler and violated subsections 8(a)(1), (2), and (5) by evicting Local 100 representatives from its property. Katz's does not appeal from these findings. Likewise, Local 131 does not appeal from the Board's determination that it violated subsections 8(b)(1)(A) and (2) of the Act by withholding dues from Kindler's paycheck without his authorization. We will discuss here only the facts relevant to the violations from which the respondents appeal
 
 
 [3]
 Pursuant to the NLRB's "contract-bar" doctrine, a valid existing collective bargaining agreement generally operates as a bar to the filing of a representation petition by a rival union. See NLRB v. Burns Int'l Sec. Servs., Inc., 406 U.S. 272, 290 n. 12, 92 S.Ct. 1571, 1583, n. 12, 32 L.Ed.2d 61 (1972); NLRB v. Rock Bottom Stores, Inc., 51 F.3d 366, 370 (2d Cir.1995); Corporation de Servicios Legales de Puerto Rico, 289 N.L.R.B. 612, 1988 WL 213791 (1988). However, in order to give employees an opportunity to choose another bargaining representative, the Board has established a thirty-day "open period" beginning ninety days before the expiration of the contract and ending sixty days before the expiration of the contract, during which election petitions may be filed. See Leonard Wholesale Meats Co., 136 N.L.R.B. 1000, 1001 (1962). The sixty-day period before the contract's expiration is an "insulated period" during which no petitions may be filed. Id. If the incumbent union does not enter into a new contract by the expiration date, an election petition may then be filed by another union. Deluxe Metal Furniture Co., 121 N.L.R.B. 995 (1958). See Sahara-Tahoe Corp. v. NLRB, 648 F.2d 553, 556 n. 4 (9th Cir.1980) (explaining contract-bar doctrine and "open period" under NLRB law), cert. denied, 451 U.S. 984, 101 S.Ct. 2317, 68 L.Ed.2d 841 (1981); NLRB v. Bayliss Trucking Corp., 432 F.2d 1025, 1027 n. 3 (2d Cir.1970) (same)
 
 
 [4]
 Pursuant to the NLRB's decision in Louisiana Dock Co., 297 N.L.R.B. 439 (1989), the ALJ ordered reimbursement of dues and fees only for those Katz's employees who were required to join Local 131 by virtue of the union security clause in the collective bargaining agreement
 
 
 [5]
 The Board did, however, refuse to adopt the ALJ's speculation that Katz's motive in violating the NLRA was "to rid itself of expensive pension and welfare obligations under its contract with Local 100."
 
 
 [6]
 29 U.S.C. § 158(a)(5) states: "It shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees...."
 
 
 [7]
 As a factual matter, this claim may not be supported by the record. The NLRB's Consolidated Complaint of May 22, 1992, alleges that Katz's violated subsections 8(a)(1) and (5) in "failing and refusing to bargain collectively and in good faith with the exclusive collective-bargaining representative of its employees." Nevertheless, our skepticism as to the factual basis for Katz's argument is of no consequence, because we reject this claim on its legal merits
 
 
 [8]
 This case would be more troubling if the record required us to conclude that Lynch violated his duty of fair representation by deliberately misleading the employees about the existence of a contract. If Katz's employees signed the petitions of support solely as a consequence of Local 100's deliberate misrepresentations, the petitions could not be credited as valid evidence of union support. However, the record does not require a rational trier of fact to find that Lynch deliberately lied to Katz's employees or that he committed any other unfair labor practice. Under the circumstances, one could reasonably conclude that Lynch merely held the erroneous belief that a contract had been reached
 
 
 [9]
 29 U.S.C. § 158(a)(2) states in pertinent part:
 It shall be an unfair labor practice for an employer to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it.
 
 
 [10]
 29 U.S.C. § 158(b)(1)(A) states:
 It shall be an unfair labor practice for a labor organization or its agents to restrain or coerce employees in the exercise of their rights....
 
 
 [11]
 Section 101.18(b) permits withdrawal of election petition by the petitioner,
 if the investigation discloses that no question of representation exists within the meaning of the statute, because among other possible reasons, the unit is not appropriate, or a written contract precludes further investigation at that time, or where the petitioner is a labor organization or a person seeking decertification and the showing of representation among the employees is insufficient to warrant an election....
 In its Decision and Order, the Board questioned whether the Regional Director's approval of Local 131's withdrawal request was appropriate under the circumstances of this case.