United States Court of Appeals
For the First Circuit

No. 98-1774

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

BEVERLY ENTERPRISES-MASSACHUSETTS, INC.,
D/B/A BEVERLY MANOR NURSING HOME,

Respondent.

ON PETITION FOR ENFORCEMENT OF AN ORDER

OF THE NATIONAL LABOR RELATIONS BOARD

Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Lipez, Circuit Judge.

Jonathan A. Keselenko, with whom David B. Ellis, Karen L.
Vossler, and Foley, Hoag & Eliot, L.L.P were on brief, for
respondent.

Rachel I. Gartner, Senior Attorney, with whom Margaret A.
Gaines, Supervisory Attorney, Frederick L. Feinstein, General
Counsel, Linda Sher, Associate General Counsel, and John D.
Burgoyne, Acting Deputy Associate General Counsel, National Labor
Relations Board, were on brief, for petitioner.

April 6, 1999

BOWNES, Senior Circuit Judge. The National Labor
Relations Board (NLRB or Board) petitioned this court for
enforcement of its final order against Beverly Enterprises-
Massachusetts, Inc. (Beverly). See 325 NLRB No. 95 (April 9,
1998). Beverly challenges the Board's order both procedurally and
substantively. 
Procedurally, the Board incorporated the Administrative
Law Judge's (ALJ's) oral bench decision, which was made without
affording Beverly an opportunity to submit written briefs. Beverly
contends that this procedure, permitted under a recent Board
regulation, 29 C.F.R. 102.42, violates Section 10(c) of the
National Labor Relations Act (NLRA or Act), 29 U.S.C. 160(c). 
For this reason, Beverly argues that the regulation is unlawful,
arbitrary and capricious. In any event, Beverly contends that the
ALJ's procedure failed to comply with the regulation. On this
question of first impression in this circuit, we reject Beverly's
procedural claims and uphold the regulation.
Substantively, Beverly asserts that the record as a whole
does not contain substantial evidence supporting the Board's
finding that Beverly violated Sections 8(a)(1) and (5) of the Act,
29 U.S.C. 158(a)(1) and (5), by unilaterally reducing the
maximum 1996 wage increase from four percent to three percent, by
unlawfully withdrawing recognition from the union representing its
employees, and by unilaterally imposing a fee for lost timecards. 
We conclude that there is such substantial evidence, and enforce
the Board's order.
I. Background
A. Facts
The Board found the following facts. Beverly operates a
nursing home in Plymouth, Massachusetts. Historically, Beverly had
given its employees annual wage increases on the anniversaries of
their respective starting dates with the company. At least as
early as 1990, Beverly had fixed the maximum wage increase at four
percent, and it awarded that amount to approximately ninety percent
of its employees.
On March 23, 1993, the NLRB certified the Hospital
Workers Union, Local 767, Service Employees International Union
(the union), as the exclusive bargaining representative of all
full-time and part-time service and maintenance employees at
Beverly's Plymouth facility. 
Beginning in June 1993, the union and the company engaged
in contract negotiations. The parties disagreed as to the amount
of wage increases the employees would receive. In October 1994,
the union told the company that it would be difficult to persuade
its unit members to accept an annual increase of less than four
percent. Later in 1994, the union negotiator indicated that the
company would have to come up from its three percent figure if the
parties were to reach agreement. At the parties' final negotiating
session, on December 13, 1995, Beverly responded to the union's
earlier proposal of four percent by proposing a two percent annual
wage increase. The union expressed shock at the newly lowered
offer and did not immediately make a counteroffer. The parties
went on to discuss an unrelated dispute (whether certain employees
were part of the bargaining unit) and tempers flared. The union
spokesperson stated that he needed to check with his attorney on
the bargaining unit issue, that he would call the company
representative, but that the latter "shouldn't hold [his] breath."
While these negotiations were taking place, Beverly
continued to provide its employees with wage increases on their
employment anniversaries, and continued to award a maximum wage
increase of four percent to the overwhelming majority of them. 
This practice changed in 1996, however. That year, the company
gave to approximately ninety percent of the company's unit
employees a maximum wage increase of three percent. Beverly did
not provide notice to the union that it would lower the maximum
wage increase from four percent to three percent, nor did Beverly
bargain with the union over the issue. Instead, Beverly
unilaterally announced the change to the union in a letter, dated
March 14, 1996. The letter described the imposition of the three
percent maximum wage increase as a "compromise" between the
parties' negotiating positions.
In approximately January 1996, Beverly changed its system
of keeping track of its employees' work time. It replaced its
system of paper timecards with a system using plastic timecards
that contained a magnetic strip. Included in its new system was a
new policy requiring unit employees to pay a five-dollar fee for
lost timecards. In making these changes, Beverly neither gave
notice to nor bargained with the union. As of the date of the NLRB
hearing on April 15, 1997, the company had collected the five-
dollar lost-timecard fee on at least seventeen occasions.
Between January and June 1996, the union contacted
Beverly on several occasions and requested that it remedy its
unilateral changes and that the parties resume bargaining. In its
letters, the union preconditioned further negotiations on Beverly's
remedying an unrelated alleged unfair labor practice.
On June 1, 1996, the union's chief negotiator and a group
of union members committed a trespass at Beverly's facility while
ostensibly handbilling Beverly's employees. On June 17, 1996, the
union again wrote Beverly offering to bargain if the latter
rectified all outstanding conduct which the union perceived to be
violative of the Act. On June 25, 1996, Beverly unilaterally
withdrew recognition of the union.
B. Board Conclusions and Order
The union filed unfair labor practice charges (ULP) with
the NLRB. A hearing was held before a Board ALJ, who found the
foregoing facts and concluded that Beverly violated Sections
8(a)(1) and (5) of the NLRA, 29 U.S.C. 158(a)(1) and (5) (1994),
in two separate respects: by unilaterally reducing the maximum
1996 wage increase from four percent to three percent, and by
unilaterally imposing a new fee for lost timecards. The ALJ also
found that the company violated the same statutory provisions by
unlawfully withdrawing recognition of the union as the exclusive
bargaining representative of Beverly's service and maintenance
employees. Based upon its findings of fact, the Board adopted both
the findings and the recommended decision of its ALJ.
As recommended by the ALJ, the Board ordered Beverly to
cease and desist from its unfair labor practices and from otherwise
interfering with, restraining, or coercing employees in the
exercise of their rights under Section 7 of the NLRA. 
Affirmatively, the Board ordered the company immediately to put
into effect the annual four percent wage increases that were
customary prior to January 1, 1996, and to continue such increases
in effect until the company negotiated a collective bargaining
agreement (CBA) with the union or reached an impasse after
bargaining in good faith. The order also required the company to
make whole unit employees for any loss of pay they had suffered due
to Beverly's unilateral reduction of the maximum wage increase.
The order further required Beverly to eliminate the five-
dollar fee charged to employees for lost timecards until it
negotiated a CBA with the union or reached an impasse after
bargaining in good faith. It required the company to make whole
its unit employees for any losses caused by the imposition of the
five-dollar fee. Finally, the order required Beverly to bargain
with the union upon request, to embody any understanding reached in
a written agreement, and to post an appropriate notice.
II. Standard of Review
The applicable standard of review for NLRB action is
provided by the National Labor Relations Act, 29 U.S.C. 160(e)
(1994), and, by default, the Administrative Procedure Act (APA), 5
U.S.C. 706 (1994). These statutes require us to apply different
standards of review depending upon what type of determination we
are reviewing. 
A. The Board's Factual Findings
The Board's findings of fact are conclusive if supported
by substantial evidence on the record considered as a whole. 29
U.S.C. 160(e); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474,
488 (1951). Substantial evidence is "such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion." 
Universal Camera, 340 U.S. at 477 (internal quotation marks
omitted), quoted in American Textile Mfrs. Inst. v. Donovan, 452
U.S. 490, 522 (1981) (ATMI); see also F.T.C. v. Indiana Fed'n of
Dentists, 476 U.S. 447, 454 (1986). The reviewing court must
consider "the record in its entirety . . ., including the body of
evidence opposed to the Board's view." Universal Camera, 340 U.S.
at 487-88; see Penobscot Air Servs., Ltd. v. F.A.A., 164 F.3d 713,
718 (1st Cir. 1999). But "the possibility of drawing two
inconsistent conclusions from the evidence does not prevent an
administrative agency's finding from being supported by substantial
evidence." ATMI, 452 U.S. at 523 (internal quotation marks
omitted).
In Allentown Mack Sales & Serv., Inc. v. N.L.R.B., 118 S.
Ct. 818, 823 (1998), the Court equated the substantial evidence
standard with "whether on this record it would have been possible
for a reasonable jury to reach the [agency's] conclusion." The
"substantial evidence" test "gives the agency the benefit of the
doubt, since it requires not the degree of evidence which satisfies
the court that the requisite fact exists, but merely the degree
that could satisfy a reasonable factfinder." Id. at 828. This is
an "objective test," id., so, for example, when the agency
"purports to be engaged in simple factfinding, . . . it is not free
to prescribe what inferences from the evidence it will accept and
reject, but must draw all those inferences that the evidence fairly
demands," id. at 829; see Indiana Fed'n of Dentists, 476 U.S. at
454. The agency's findings "must . . . be set aside when the
record before a Court of Appeals clearly precludes the Board's
decision from being justified by a fair estimate of the worth of
the testimony of witnesses or its informed judgment on matters
within its special competence or both." Universal Camera, 340 U.S.
at 490. 
B. The Board's Decisions on Legal Issues.
Because the NLRA is silent as to the standard for
reviewing nonfactual matters, the standard of review for such
matters is provided by section 10(e) of the Administrative
Procedure Act. Errors of law are reviewed by the court de novo. 
See 5 U.S.C. 706 ("[T]he reviewing court shall decide all
relevant questions of law."); Bureau of Alcohol, Tobacco and
Firearms v. Federal Labor Relations Auth., 464 U.S. 89, 97 n.7
(1983); Penobscot, 164 F.3d at 718. "The legal issues presented 
that is, the identification of governing legal standards and their
application to the facts found are, by contrast [to factual
findings], for the courts to resolve, although even in considering
such issues the courts are to give some deference to the [agency's]
informed judgment" in applying statutory terms if the statute is
silent or ambiguous on the issue. Indiana Fed'n of Dentists, 476
U.S. at 454.
That deference is described in the familiar two-step test
of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,
467 U.S. 837, 842-44 (1984), which applies to the NLRB as to other
agencies. "On a pure question of statutory construction, our first
job is to try to determine congressional intent, using 'traditional
tools of statutory construction.' If we can do so, then that
interpretation must be given effect, and [agency regulations] must
be fully consistent with it." N.L.R.B. v. United Food & Commercial
Workers' Union, Local 23, 484 U.S. 112, 123 (1987) (UFCW) (emphasis
added) (quoting I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 446-48
(1987)). Thus, if the legislative intent is clear, we do not defer
to the agency and we end the Chevron analysis at step one. SeeChevron, 467 U.S. at 843; Penobscot, 164 F.3d at 719.
We reach the second step of Chevron if "the statute is
silent or ambiguous with respect to the specific issue"; then "the
question for the court is whether the agency's answer is based on
a permissible construction of the statute." UFCW, 484 U.S. at 123
(quoting Chevron, 467 U.S. at 843). "Under this principle, we have
traditionally accorded the Board deference with regard to its
interpretation of the NLRA as long as its interpretation is
rational and consistent with the statute." Id.; see also Auciello
Iron Works, Inc. v. N.L.R.B., 517 U.S. 781, 787-88 (1996) (noting
"the 'considerable deference' that the Board is due by virtue of
its charge to develop national labor policy, through interstitial
rulemaking that is 'rational and consistent with the Act'" (quoting
N.L.R.B. v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 786-87
(1990)).
Even where such deference is due, the agency's
"explication" of its reasoning cannot be "inadequate, irrational or
arbitrary." Allentown Mack, 118 S. Ct. at 822 (internal quotation
marks omitted); see id. at 826 (The APA "establishes a scheme of
reasoned decisionmaking," under which "[n]ot only must an agency's
decreed result be within the scope of its lawful authority, but the
process by which it reaches that result must be logical and
rational." (Internal quotation marks omitted)); Bureau of Alcohol,
Tobacco and Firearms, 464 U.S. at 97 (explaining that reviewing
court "must not rubber-stamp . . . administrative decisions"). 
"The reviewing court remains the final authority on issues of
statutory construction." Penobscot, 164 F.3d at 719 (internal
quotation marks omitted); see 5 U.S.C. 706(2)(A).
C. Review of the Board's Other Action and Conclusions
With respect to other agency action, findings, and
conclusions, the APA requires the reviewing court to hold them
unlawful and set them aside if they are found to be "arbitrary,
capricious, an abuse of discretion, or otherwise not in accordance
with law." 5 U.S.C. 706(2)(A). Certain agency rules are among
the agency actions that may be subjected to the "arbitrary or
capricious" standard. See Motor Vehicle Mfrs. Ass'n v. State Farm
Mut. Auto. Ins. Co., 463 U.S. 29 (1983) (setting aside an agency
rule as "arbitrary and capricious" where agency failed to consider
a viable alternative to rescinding its rule, and where agency's
reasoning was inadequate in light of the data before it); Kenneth
Culp Davis & Richard J. Pierce, Jr., 1 Administrative Law Treatise 7.4 (3d ed. 1994).
The task of a court reviewing agency action under the
APA's "arbitrary or capricious" standard is to determine whether
the agency has examined the pertinent evidence, considered the
relevant factors, and "articulate[d] a satisfactory explanation for
its action including a 'rational connection between the facts found
and the choice made.'" State Farm, 463 U.S. at 43 (quoting
Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168
(1962)); see Baltimore Gas & Elec. Co. v. Natural Resources Defense
Council, Inc., 462 U.S. 87, 105 (1983) (citations omitted). 
The reviewing court must "look to see if the agency
decision, in the context of the record, is too unreasonable (given
its statutory and factual context) for the law to permit it to
stand." Sierra Club v. Marsh, 976 F.2d 763, 769 (1st Cir. 1992)
(internal quotation marks omitted). 
In State Farm, the Supreme Court offered several examples
of circumstances in which an agency action "normally" would be
considered arbitrary and capricious: situations where "the agency
has relied on factors which Congress has not intended it to
consider, entirely failed to consider an important aspect of the
problem, offered an explanation for its decision that runs counter
to the evidence before the agency, or is so implausible that it
could not be ascribed to a difference in view or the product of
agency expertise." State Farm, 463 U.S. at 43. "These are merely
'examples,' Puerto Rico Sun Oil Co. v. United States E.P.A., 8 F.3d
73, 77 (1st Cir. 1993); others could be recited as well." Duboisv. United States Dep't of Agric., 102 F.3d 1273, 1285 (1st Cir.
1996). "The reviewing court should not attempt itself to make up
for such deficiencies; we may not supply a reasoned basis for the
agency's action that the agency itself has not given." State Farm,
463 U.S. at 43 (citing S.E.C. v. Chenery Corp., 332 U.S. 194, 196
(1947)).
"While this is a highly deferential standard of review,
it is not a rubber stamp." Penobscot, 164 F.3d at 720 (quoting
Dubois, 102 F.3d at 1285). Although "the ultimate standard of
review is a narrow one," the court must undertake "a thorough,
probing, in-depth review" and a "searching and careful" inquiry
into the record. Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402, 415-16 (1971). In order for an agency decision to
pass muster under the APA's "arbitrary and capricious" test, the
reviewing court must determine that the decision is "rational,"
Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n,
59 F.3d 284, 290 (1st Cir. 1995), that it "make[s] . . . sense,"
Puerto Rico Sun Oil, 8 F.3d at 77. Only by "carefully reviewing
the record and satisfying [itself] that the agency has made a
reasoned decision" can the court "ensure that agency decisions are
founded on a reasoned evaluation of the relevant factors." Marshv. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989)
(internal quotation marks omitted).
III. Discussion
A. General Principles
An employer's duty to bargain with its employees' chosen
representatives is an essential element of our national labor
policy. "The object of [the NLRA] was . . . to insure that
employers and their employees could work together to establish
mutually satisfactory conditions [of employment]. The basic theme
of the Act was that through collective bargaining the passions,
arguments, and struggles of prior years would be channeled into
constructive, open discussions leading, it was hoped, to mutual
agreement." Ford Motor Co. v. N.L.R.B., 441 U.S. 488, 498 (1979)
(quoting H.K. Porter Co. v. N.L.R.B., 397 U.S. 99, 103 (1970)); seeid. at 502 n.14 (explaining benefits of collective bargaining);
Auciello Iron Works, 517 U.S. at 785. The duty to bargain is part
and parcel of that policy's preference for resolving labor disputes
peacefully, through good faith collective bargaining, rather than
by means of industrial strife which has a destructive effect on the
economy. See United Steelworkers of America v. Warrior & Gulf
Navigation Co., 363 U.S. 574, 578 (1960) (describing federal labor
policy as "to promote industrial stabilization through the
collective bargaining agreement"); Textile Workers v. Lincoln
Mills, 353 U.S. 448, 453-55 (1957) (In passing the NLRA, Congress's
purpose was to encourage collective bargaining and thereby promote
"industrial peace."); N.L.R.B. v. Lion Oil Co., 352 U.S. 282, 289
(1957) (The Court has "recognized a dual purpose in the Taft-
Hartley Act to substitute collective bargaining for economic
warfare and to protect the right of employees to engage in
concerted activities for their own benefit." (internal quotation
marks omitted)).
Because of these policy considerations, Section 8(a)(5)
of the NLRA, as amplified by Section 8(d), requires an employer to
bargain collectively with its employees' representatives over
"wages, hours, and other terms and conditions of employment." 29
U.S.C. 158(a)(5), 158(d). Section 8(a)(5) makes it an unfair
labor practice for an employer "to refuse to bargain collectively
with the representatives of [its] employees . . . ." 29 U.S.C.
158(a)(5). That section is also violated if an employer
unilaterally changes any term or condition of employment without
affording the union representing its employees a meaningful
opportunity to negotiate "in fact." N.L.R.B. v. Katz, 369 U.S.
736, 743 (1962); see 29 U.S.C. 158(a)(5). In addition, "it is
generally unlawful for an employer to withdraw recognition of the
union as a means of refusing to bargain." Bolton-Emerson, Inc. v.
N.L.R.B., 899 F.2d 104, 106 (1st Cir. 1990).
B. The Anniversary Wage Increases
A pay system in which the employer does not exercise
discretion in the timing or the amount of the wage increase awarded
is a mandatory subject of bargaining. See Daily News of Los
Angeles, 315 NLRB 1236, 1239 (1994), enforced, 73 F.3d 406 (D.C.
Cir. 1996); Central Maine Morning Sentinel, 295 NLRB 376, 378-79
(1989) ("[T]he exercise of some discretion is not fatal to the
conclusion that the raise was a condition of employment.");
Southeastern Michigan Gas Co., 198 NLRB 1221, 1222-23 (1972),
enforced, 485 F.2d 1239 (6th Cir. 1973). This means, with respect
to the anniversary wage increases, that an employer cannot
unilaterally change the status quo, as Beverly did here, without
bargaining with the union. Even during negotiations, an employer
must maintain the "dynamic status quo" pertaining to employees'
wages. Eastern Maine Med. Ctr. v. N.L.R.B., 658 F.2d 1, 8 (1st
Cir. 1981) (In light of longstanding practice of regular wage
increases to keep up with inflation and community wage patterns as
reflected in periodic wage surveys, an "[i]ndefiniteness as to
amount and a flavor of discretion do not . . . prevent the
undertaking from becoming part of the conditions of employment."). 
Thus, "[a]n employer with a past history of a merit increase
program [may not] discontinue that program . . . once an exclusive
bargaining agent is selected." Oneita Knitting Mills, 205 NLRB
500, 500 n.1 (1973). Therefore, by unilaterally changing the
amount of a fixed wage increase without bargaining with the
certified representative of its employees, an employer violates
Section 8(a)(5) of the Act. See Daily News of Los Angeles, 315
NLRB at 1239; Southeastern Michigan Gas Co., 198 NLRB at 1222-23. 
In a case with facts very similar to those here, the NLRB held that
an employer's unilateral revocation of a company policy granting
annual wage increases to keep pace with the wages of its main
competitor violated the Act. See UARCO, Inc., 283 NLRB 298, 299-
301 (1987).
Based on the record before it, the Board found that, in
implementing a three percent maximum wage increase in 1996, Beverly
made a unilateral change to the terms and conditions of employment,
in violation of the Act. Beverly does not dispute that, between
1990 and 1995, Beverly gave its employees a four percent maximum
wage increase on the anniversaries of their respective dates of
employment. Substantial evidence supports the Board's factual
finding that, in 1996, without reaching agreement with the union or
reaching impasse, Beverly gave its employees a maximum wage
increase of three percent. The Board concluded that the company's
system of annual wage increases was a mandatory subject of
collective bargaining, and therefore that the company, by
unilaterally changing the maximum wage increase awarded, violated
Section 8(a)(5) of the Act.
On this issue as on others, the Board's construction of
the Act should be upheld if it is "reasonably defensible." Ford
Motor Co., 441 U.S. at 497. Particularly with respect to
determinations that fall within the Board's "special expertise,"
such as whether an issue is a mandatory subject of bargaining, the
Board is entitled to "considerable deference." Id. at 495; seeAuciello Iron Works, 517 U.S. at 787-88; Daily News of Los Angelesv. N.L.R.B., 73 F.3d 406, 410-11 (D.C., Cir. 1996) (holding that
merit-increase program is a mandatory subject of bargaining). Such
is the case here, with respect to the Board's determination.
It does not take much deference to agree that proposed
changes to the company's system of annual wage increases in this
case, the maximum increase the company will allow is a mandatory
subject of collective bargaining. It is also easy to agree that
unilateral changes to that system violate Section 8(a)(5). It is
important to our national labor policy that companies not act
unilaterally on subjects of mandatory bargaining; doing so defeats
the whole purpose of that policy's preference for peaceful
negotiation of disputes rather than industrial strife. See 
Warrior & Gulf, 363 U.S. at 578; Lion Oil Co., 352 U.S. at 289.
Beverly argues that the three percent wage increase in
1996 was not in fact a unilateral change, indeed was not a change
at all, but was based on the same formula it had applied in the
past when it granted a four percent maximum wage increase. 
Beverly's witnesses testified that company officials determined the
1996 maximum wage increase exclusively by applying the same
"established formula" that the company had used in the past to
reach the four percent increase.
Beverly asserts that the ALJ's decision failed to discuss
this uncontradicted testimony. But Beverly incorrectly concludes
that this means the ALJ "failed to consider" Beverly's testimony. 
An ALJ can consider all the evidence without directly addressing in
his written decision every piece of evidence submitted by a party. 
Nor must an ALJ make "explicit credibility findings" as to each bit
of conflicting testimony, so long as his factual findings as a
whole show that he "implicitly resolve[d]" such conflicts. 
N.L.R.B. v. Berger Transfer & Storage Co., 678 F.2d 679, 687 (7th
Cir. 1982); see N.L.R.B. v. Katz's Delicatessen of Houston St.,
Inc., 80 F.3d 755, 765 (2d Cir. 1996) (An ALJ may resolve
credibility disputes implicitly rather than explicitly where his
"treatment of the evidence is supported by the record as a
whole.").
Here, the Board "explicitly reject[ed] Beverly's factual
contention that the 3 percent maximum increase was the result of
its consistent application of an inflexible formula." Instead, the
Board placed great weight on the company's March 14, 1996 letter,
in which Beverly indicated that the three percent maximum wage
increase for 1996 was a "compromise between the [Company's]
proposals for 2% anniversary merit increases and the Union's
proposals for 4% anniversary merit increases." Even in the face of
this admission, Beverly would have the Board accept at face value
the self-serving representations of Beverly's Human Resources
Director, Jay Begley, that, by some extraordinary coincidence,
Beverly's application of its pre-existing formula for calculating
wage increases resulted in the same 3% increase reflected in the
"compromise" position. The Board reasonably found that the
contemporaneous letter was a "direct explanation" of the company's
decision to reduce the maximum wage increase from four to three
percent, and "as such constitutes an admission that the 1996
maximum wage increases were not tied to any prior formula used" in
past years by the company. Substantial evidence supports this
conclusion.
Beverly argues, in the alternative, that, even if the
three percent wage increase did constitute a unilateral change, it
did not violate the NLRA because the parties were at impasse and
the union "had taken an intractable position." The Board properly
rejected this contention as well.
Before an employer may undertake any unilateral changes,
"[t]here is a strong requirement that impasse be clear . . . in
order to insure the integrity of the bargaining process." Bolton-
Emerson, 899 F.2d at 108. This is particularly important because,
as noted, our national labor policy prefers peaceful collective
bargaining rather than destructive industrial strife. "Impasse
occurs when, after good faith bargaining, the parties are
deadlocked so that any further bargaining would be futile," id.,
i.e., when "there [is] no realistic prospect that continuation of
discussions at that time would . . . [be] fruitful," Teamsters
Local Union No. 639 v. N.L.R.B., 924 F.2d 1078, 1083 (D.C. Cir.
1991) (alteration in original) (internal quotation marks omitted). 
The law is clear that employer and union representatives must fully
pursue bargaining in good faith; they cannot hide behind zealous or
even passionate advocacy on the part of their adversaries to short-
circuit the collective bargaining process by claiming that the
disfavored point of impasse has been reached. See N.L.R.B. v.
Powell Elec. Mfg. Co., 906 F.2d 1007, 1011-12 (5th Cir. 1990)
(stating that small number of substantive bargaining sessions
weighs strongly against existence of impasse); Teamsters Local
Union No. 639, 924 F.2d at 1083-84 (holding that brevity of
parties' negotiations on issue and union's position that it still
"had more movement to make" undermine employer's declaration of
impasse); N.L.R.B. v. WPIX, Inc., 906 F.2d 898, 902 (2d Cir. 1990)
(concluding that union's dismissal of employer's proposals as
"ridiculous" or a "slap in the face" did not constitute conclusive
evidence of impasse, recognizing that "exaggeration, posturing and
dilatory tactics . . . might be expected in labor negotiations");
Atlas Tack Corp., 226 NLRB 222, 225 (1976) (no impasse found where
there was no indication that "the parties had bargained over a
period of time with the result of little or no progress").
As we have recognized, in determining whether the parties
reached good-faith impasse, "the particular facts and complexities
of the bargaining process are 'particularly amenable to the
expertise of the Board as factfinder.'" Bolton-Emerson, 899 F.2d
at 108 (quoting Saunders House v. N.L.R.B., 719 F.2d 683, 688 (3d
Cir. 1983)). Moreover, "few issues are less suited to appellate
judicial appraisal than evaluation of bargaining processes or
better suited to the expert experience of a Board [that] deals
constantly with such problems." Id. Substantial evidence supports
the Board's finding here that the parties had not reached impasse
on the question of wage increases. 
As appears from the record, the parties specifically
discussed wages at only two bargaining sessions: a session in
October 1994 at which the union representative stated that it would
be difficult to persuade its unit members to accept an increase of
less than four percent, and the last bargaining session on
December 13, 1995, where Beverly's representative, Jay Begley,
first proposed a two percent maximum wage increase, leading a union
representative to express shock and anger at that proposal, making
no counteroffer. At the latter session, the parties went on to
argue about an unrelated dispute, tempers flared, and the union
representative said he had to check with his attorney about the
unrelated matter, that he would call Begley but that the latter
"shouldn't hold his breath." Neither party ever presented a final
offer on the matter of wage increases.
Beverly relies heavily on the "hold his breath" comment. 
The company also asserts that the union "withdrew from bargaining
for more than six months," that "Beverly received no communication
beyond a few, unlawful letters from the Union after December 1995,
in the wake of its Director's statement to Begley." 
Comparing the instant facts even the "hold his breath"
comment to those of the precedents cited supra, we have no
difficulty upholding the Board's finding that the evidence fell far
short of establishing that the parties had reached impasse on the
question of wages. See WPIX, Inc., 906 F.2d at 902; Teamsters
Local Union No. 639, 924 F.2d at 1083-84; Powell Elec. Mfg. Co.,
906 F.2d at 1011-12. The "hold his breath" comment is similar to
the comments that were insufficient to demonstrate impasse in WPIX,
Inc., 906 F.2d at 902 (union's comments dismissing employer's
proposals as "ridiculous" and a "slap in the face").
Nor does Beverly get any mileage from the union
representative's statement that "it would be very difficult for the
Union to sell an increase of less than 4 percent to the unit." To
say that a proposal "would be difficult . . . to sell" is not the
same as a rigid assertion that the union simply would not be moved
from a four percent "bottom line." Nor does it constitute a
withdrawal from negotiations unless the company offers four
percent, as Beverly asserts; on the contrary, the statement implies
a continuing willingness of the party to negotiate, while pointing
out one area in which a lot of movement will be "difficult." 
Indeed, the record contains evidence that the union continued to
negotiate, and stated a willingness to continue to negotiate, on a
number of occasions after the statement relied upon by Beverly,
including several requests, subsequent to the December 1995
bargaining session, that the parties resume negotiations. SeeTeamsters, 924 F.2d at 1083-84.
Moreover, as discussed infra, Beverly's characterization
of the union's subsequent actions as a withdrawal from bargaining
is flawed. Whether or not Beverly liked the union's letters 
indeed, whether or not the letters contained some proposals that
were inappropriate (such as tying the irrelevant issue of an
enlarged bargaining unit to the current negotiations) the union
made it clear in its letters that it desired to continue the
collective bargaining process. The parties were a long way from
impasse, as the Board and the courts have defined it through their
precedents.
For the foregoing reasons, substantial evidence supports
the Board's finding that Beverly's reduction of the maximum wage
increase was a unilateral change in the terms and conditions of
employment, imposed when the parties were not at impasse, and we
must uphold the Board's finding that Beverly violated Sections
8(a)(1) and (5) of the Act by unilaterally reducing the maximum
wage increase from four percent to three percent.
C. The Fee for Lost Timecards The second unfair labor practice found by the Board was
Beverly's unilateral imposition of a five-dollar charge for lost
timecards. The company does not dispute that it implemented a new
policy in January 1996 requiring all employees to pay a five-dollar
charge for lost timecards, nor that it undertook this new policy
without notice to or bargaining with the union. Beverly
characterizes the change as a mere "change to time-clock
procedure," and argues that it therefore does not rise to the level
of a change in terms and conditions of employment. 
But Beverly mischaracterizes the issue: the union did
not argue and the Board did not find that Beverly had to bargain
with the union about a purely mechanical change to its "time-clock
procedure." The Board held that the company's charging of a fee 
to employees for lost timecards not the procedure that management
required workers to follow to record their time constituted a
change in a term or condition of employment, and therefore
Beverly's unilateral change in such terms or conditions without
first pursuing collective bargaining violated the NLRA. SeeN.L.R.B. v. Katz, 369 U.S. at 743. 
This general principle has been upheld in many different
contexts. See N.L.R.B. v. Maine Caterers, Inc., 732 F.2d 689, 691
(1st Cir. 1984) (Breyer, J.) (upholding finding that employer
violated Act by unilaterally changing work practices, and rejecting
argument that the changes were too minor to have significant
effect); St. Luke's Hosp., 314 NLRB 434 (1994) (employer's
unilateral change of dress code violated NLRA); Rangaire Co., 309
NLRB 1043 (1992) (unilateral elimination of extra fifteen minutes
of lunch break at Thanksgiving violated Act), enforced without
opinion, 9 F.3d 104 (5th Cir. 1993); Martin Marietta Energy Sys.,
283 NLRB 173 (1987) (modification of CBA by adding HMO to existing
medical coverage constituted unlawful unilateral change), enforced
without opinion, 842 F.2d 332 (6th Cir. 1988).
One of those contexts is remarkably similar to the
present case: in Millard Processing Servs., Inc., 310 NLRB 421,
424-25 (1993), the Board held that an employer violated the NLRA by
imposing a fifteen-dollar replacement fee for lost checks. Beverly
argues that its imposition of a fee for lost timecards did not
violate the Act because the action did not involve a "material,
substantial, and significant" change in the terms and conditions of
bargaining-unit employees. See id.; Litton Syss., 300 NLRB 324,
331 (1990), enforced, 949 F.2d 249 (8th Cir. 1991). The Board held
in Millard Processing that the imposition of a replacement fee
qualifies as a "material, substantial, and significant" change in
the terms and conditions of employment. 310 NLRB at 424-25. 
Moreover, the Board's determination that the imposition of a fee
for lost timecards is a mandatory subject of bargaining is entitled
to considerable deference "because the classification of bargaining
subjects as terms or conditions of employment is a matter
concerning which the Board has special expertise." Daily News of
Los Angeles, 73 F.3d at 411 (quoting Ford Motor Co., 441 U.S. at
495). 
Beverly relies on Rust Craft Broad. of New York, Inc.,
225 NLRB 327 (1976), to support its position that the company's
changing its timekeeping procedures was within its management
prerogative and not a change in terms or conditions of employment
that is a mandatory subject of bargaining. Such reliance is
misplaced. The employer in Rust Craft simply instituted a "change
to a mechanical procedure for recording working time," installing
time clocks to replace its former system of requiring employees to
record their time manually. Id. at 327. The company's actions did
not impose any new monetary burdens on its employees. But
Beverly's actions here did impose such burdens: the employees had
to pay five dollars for any lost timecards.
Beverly also argues that the five-dollar charge simply
reflected Beverly's passing along its cost to replace a card. But
how Beverly derived its five-dollar fee is not the issue. It may
be perfectly fair, but the problem is that the fee constitutes a
change in the terms and conditions of employment and Beverly must
bargain with the union over such issues, not unilaterally impose
them (unless impasse is reached).
The only legitimate question Beverly raises is whether
its unilateral change in the terms and conditions of employment is
"nominal," so "insignificant" as to be de minimis. Put another
way, is the size of the replacement fee so small that Beverly could
impose it without having to negotiate with the union at all? 
We see no reason not to defer to the Board's conclusion
that the fee should have been the subject of bargaining before
being imposed. Although a five-dollar fee is getting close to the
de minimis line, we need not decide where that line is. Cf.Millard Processing, 310 NLRB at 424-25 (fifteen-dollar fee for
replacing lost checks).
More importantly, our national labor policy prefers
employers and employees to bargain collectively over terms and
conditions of employment, rather than to take unilateral action
that can lead to industrial strife. Under that labor policy, the
presumption is in favor of a duty to bargain, and against an
exception to that duty on the ground that the unilateral action is
allegedly de minimis.
D. Withdrawing Recognition from the Union
Beverly also violated the NLRA by withdrawing recognition
from the union. There is no dispute that the company withdrew such
recognition on June 25, 1996. Beverly argues that it was justified
in doing so, based on three independent justifications. We agree
with the Board that each of Beverly's contentions is without merit. 
The same essential reasoning applies in this area as applied with
the above-described changes in terms and conditions of employment. 
The NLRA favors an employer's duty to bargain collectively; the
presumption is against the appropriateness of an employer's
unilaterally withdrawing recognition from a certified labor
organization representing its employees.
Beverly points first to the union's "unlawful invasion"
of company premises on June 1, 1996, as justification for the
withdrawal of recognition. On that date, a group of union
supporters, including its chief negotiator, entered the nursing
home facility and attempted to handbill employees. This arguably
constituted an unfair labor practice, as well as a trespass,
tortious and/or criminal.
In extreme circumstances, the Board has withheld
otherwise appropriate bargaining orders. Beverly cites two such
cases, N.L.R.B. v. Union Nacional de Trabajadores, 540 F.2d 1 (1st
Cir. 1976), and Laura Modes, 144 NLRB 1592 (1962). But
significantly, in Trabajadores and Laura Modes, it was the Boardthat applied the sanction, not the employer that unilaterally
withdrew recognition of the union. Beverly has not cited any cases
in which an employer has been allowed unilaterally to withdraw
recognition of a union as a form of "self-help" even in response to
violent tactics. Moreover, as we have held, even the issuance of
a decertification order by the Board "is an extreme measure and
should be entered only when the Board has first demonstrated that
there are no equally effective alternative means of promoting the
objectives of the Act." Union Nacional de Trabajadores, 540 F.2d
at 13.
There is another reason why Beverly's withdrawal of
recognition was unjustified, in addition to the company's engaging
in self-help rather than pursuing the statutorily-provided means of
filing a complaint with the Board. The conduct in Trabajadores,
Laura Modes and similar cases was far more egregious than that of
the union here: the union "engaged in violent misconduct so
aggravated as to preclude the maintenance of normal collective
bargaining relationships." Trabajadores, 540 F.2d at 13; see alsoLaura Modes, 144 NLRB at 1596 (finding that the union exhibited "a
total disinterest in enforcing its representation rights through
the peaceful legal process provided by the Act," and instead
"resorted to and/or encouraged the use of violent tactics to compel
their grant"). In Laura Modes, a union agent and eight non-
employee union members entered the employer's plant, struck a
management official in the face when he threatened to call the
police, and "pushed around" an office employee. A few days later,
a union member followed an official of the employer as he left the
plant and pointed him out to a group of four men, who beat him up. 
144 NLRB at 1594. Similarly, in Union Nacional de Trabajadores,
540 F.2d at 6-7, the Board revoked a union's certification where
the union president (1) "brutally" assaulted the president of the
employer in the presence of employees and (2) threatened employees
with serious bodily harm if they continued to work during a union-
sponsored strike: "This is Union Nacional and we kill people. So
leave." See also So-Lo Foods, Inc., 303 NLRB 749 (1991) (noting
that the principle of Laura Modes "is only rarely applied to
deprive a union of representative rights," is limited to behavior
similar to the "repugnant and barbaric" attacks in Laura Modes, and
even then, the union would not be permanently barred).
The union's trespass in the instant case with no
violence committed or threatened did not come close to the level
of egregiousness that would justify a withdrawal of recognition,
even by the Board. We cannot agree with Beverly that one incident
of trespass, with no violence at all, demonstrates per se that the
"union has abandoned any interest in carrying on collective
bargaining on behalf of its members through lawful means and has
instead sought to ensure their support through coercion." Resp't
Br. at 31. Cf. N.L.R.B. v. Honaker Mills, 789 F.2d 262, 267 (4th
Cir. 1986) ("picket line taunts and jeers" are no defense to a
refusal to bargain); N.L.R.B. v. Triumph Curing Ctr., 571 F.2d 462,
476-77 (9th Cir. 1978) (withholding of bargaining order not
justified, notwithstanding "extremes of verbal abuse and serious
threats of physical violence" during first month of protracted
strike). 
Beverly's second argument to justify its unilateral
withdrawal of recognition is that the union "had become defunct." 
But, as the Board found, the record does not reflect the union's
inability or unwillingness to perform its representative functions. 
Beverly relies on one statement by one union representative to one
company representative that the latter should not "hold [his]
breath" waiting for a response to the company's just-disclosed
proposal of a two percent wage increase. But that comment is not
a basis for withdrawing recognition. Nor is a six-month break in
negotiations, also pointed to by Beverly. See N.L.R.B. v. Flex
Plastics, Inc., 726 F.2d 272, 275 (6th Cir. 1984) (per curiam)
(rejecting argument that union "inaction" was legitimate basis for
withdrawal of recognition: "The Company had no evidence that the
Union-employee relationship was not an active one, only that the
Union-management relationship was inactive."); Pennex Aluminum
Corp., 288 NLRB 439, 441 (1988) (more than two years since the last
negotiating session, but delay was "explained by factors other than
loss of employee support"), enforced without opinion, 869 F.2d 590
(3d Cir. 1989).
Beverly's final justification for its withdrawal of
recognition is that the union "placed unlawful conditions" on
bargaining, tying further bargaining to unrelated issues such as
expanding the bargaining unit and settling an unfair labor practice
charge that the union had filed against the company. The union's
actions may well have constituted unfair labor practices, and, if
the company had filed such complaints with the Board, it is quite
possible that the Board would have so held, depending of course on
the facts found by the Board. See Magic Chef, Inc., 288 NLRB 2, 10
(1988) (holding that union may not demand, as a condition of
signing CBA, that employer agree to settle pending ULP charges). 
But as the Board (through its ALJ) properly concluded, Beverly is
not permitted to withdraw recognition unilaterally "simply because
the Union is argued to have violated [the Act] by making a
conditional offer to bargain" or otherwise. Such issues are for
the Board to resolve; Beverly's self-help is inappropriate.
We too have previously recognized that employers are
prohibited from withdrawing recognition of a union as a form of
"self-help" against a union's unfair labor practices, because
"[t]he underlying purpose of this statute is industrial peace." 
N.L.R.B. v. U.S. Sonics Corp., 312 F.2d 610, 616 (1st Cir. 1963)
(quoting Brooks v. N.L.R.B., 348 U.S. 96, 103 (1954)). We
emphasize again that self-help is to be discouraged and collective
bargaining encouraged. At most, an employer that believes that a
union has committed an unfair labor practice should pursue the
neutral process of complaining to the NLRB, rather than engaging in
self-help. Self-help on the part of a union is, of course, equally
discouraged.
IV.
The only colorable question raised by Beverly is its
argument that the ALJ's decision was procedurally defective because
he chose to dispense with briefs and issue a bench decision.
The legality of the Board's decision-making process is a
subcategory of legal issues, and will therefore be reviewed de
novo. See 5 U.S.C. 706. 
A. Legitimacy of the Regulation
Beverly challenges both the Board's authority to issue
the regulation in question, citing Section 10(c) of the Act, 29
U.S.C. 160(c), and the manner in which it applied the regulation
in the instant case. As to the former, Congress authorized the
Board "to make such rules and regulations as may be necessary to
carry out the provisions of the Act." 29 U.S.C. 156. This
section of the Act affords the Board "broad rulemaking authority,"
American Hosp. Ass'n v. N.L.R.B., 499 U.S. 606, 613 (1991),
particularly with respect to rules of procedure, see Vermont Yankee
Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435
U.S. 519, 543-44 (1978) (recognizing the "very basic tenet of
administrative law that agencies should be free to fashion their
own rules of procedure"). Of course, "however sweeping [the]
delegation of authority [to an agency], it is not unlimited"; a
reviewing court will only sustain regulations where it is
"reasonably able to conclude that the grant of authority
contemplates the regulations issued," Planned Parenthood Fed'n,
Inc. v. Heckler, 712 F.2d 650, 655 (D.C. Cir. 1983) (quoting
Chrysler Corp. v. Brown, 441 U.S. 281, 308 (1979)); see Kent v.
Dulles, 357 U.S. 116, 129 (1958), and the regulations are
"permissible" under Chevron, 467 U.S. at 843.
Beverly is correct that the regulation at issue here
reflects a change from the Board's prior procedure, and that such
revisions may be entitled to less deference than a position
consistently held.
[A]n administrative agency is not disqualified
from changing its mind; and when it does, the
courts still sit in review of the
administrative decision and should not
approach the statutory construction issue de
novo and without regard to the administrative
understanding of the statutes. On the other
hand, the consistency of an agency's position
is a factor in assessing the weight that
position is due. As [the Court has] stated: 
"An agency interpretation of a relevant
provision which conflicts with the agency's
earlier interpretation is 'entitled to
considerably less deference' than a
consistently held view." INS v. Cardoza-
Fonseca, 480 U.S. 421, 446 n.30 (1987)
(quoting Watt v. Alaska, 451 U.S. 259, 273
(1981)). How much weight should be given to
the agency's views in such a situation, and in
particular where its shifts might have
resulted from intervening and possibly
erroneous judicial decisions and its current
position from one of our own rulings, will
depend on the facts of individual cases.

Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417 (1993) (some
internal citations and quotation marks omitted); see also F.E.C. v.
Democratic Senatorial Campaign Comm., 454 U.S. 27, 37 (1981)
(observing that "the thoroughness, validity, and consistency of an
agency's reasoning are factors that bear upon the amount of
deference to be given an agency's ruling," but ultimately deferring
to inconsistent agency position).
The rule at issue in the instant case is the following:
Any party shall be entitled, upon request, to
a reasonable period at the close of the
hearing for oral argument, which may include
presentation of proposed findings and
conclusions, and shall be included in the
stenographic report of the hearing. In the
discretion of the administrative law judge,
any party may, upon request made before the
close of the hearing, file a brief or proposed
findings and conclusions, or both, with the
administrative law judge, . . . . In any case
in which the administrative law judge believes
that written briefs or proposed findings of
fact and conclusions may not be necessary, he
or she shall notify the parties at the opening
of the hearing or as soon thereafter as
practicable that he or she may wish to hear
oral argument in lieu of briefs.

29 C.F.R. 102.42 (1998).

Beverly contends that this regulation cannot stand
because the procedure contained therein violates Section 10(c) of
the Act, 29 U.S.C. 160(c). But Section 10(c) cannot bear the
weight that Beverly seeks to load upon it. The statute does not
entitle parties to an opportunity to file written briefs instead of
oral argument; it states that parties "may" file briefs "in [the]
discretion [of the ALJ]." 29 U.S.C. 160(c). The taking of
testimony is treated differently than the making of arguments at
the close of the testimony. "The testimony taken by [the ALJ]
shall be reduced to writing and filed with the Board. Thereafter,
in its discretion, the Board upon notice may take further testimony
or hear argument." Id. (emphasis added). 
Thus, Beverly gains nothing by arguing that the
regulation "conflicts with Congressional intent as expressed in the
Act" because Section 10(c), in Beverly's words, "unambiguously
requires the testimony taken by the ALJ to be 'reduced to
writing.'" Resp't Br. at 18 (first emphasis added) (quoting 29
U.S.C. 160(c)). Beverly does not contend that the ALJ failed to
reduce any "testimony" to writing, only that Beverly was not
permitted to submit a written brief instead of making an oral
argument at the close of all the evidence. 
It is true, as Beverly further argues, that the statute
goes on to require, where evidence is presented to an ALJ, that the
ALJ "shall issue and cause to be served on the parties to the
proceeding a proposed report, together with a recommended order,
which shall be filed with the Board." Id. But here too, there is
nothing to preclude, either implicitly or explicitly, the agency
from adopting the procedure permitted in the challenged rule: 
requiring the ALJ to "certify the accuracy of the pages of the
transcript containing the decision" and to cause a copy of those
pages to be served on the parties and filed with the Board. 29
C.F.R. 102.45. In light of the deference due to the Board's
interpretation of the Act, we see no reason to disturb the Board's
conclusion that "these provisions provide for a written decision,
in the form of a certified copy of the record pages containing the
judge's full decision, which is served on the parties, in full
compliance with the provisions of Section 10(c) of the Act." 59
Fed. Reg. 65,942, 65,944 (Dec. 22, 1994).
Beverly also claims that the Board, in adopting that
regulation, overruled its long-standing precedent without supplying
adequate reasons for doing so. Resp't Br. at 19 (citing Plumbers,
Local 195 (Stone & Webster), 237 NLRB 931 (1978); Plastic Film
Prods. Corp., 232 NLRB 722 (1977)). Beverly argues that the Board
acted arbitrarily and capriciously in violation of the APA by
amending its regulation, "because [of] the Board's mystifying lack
of reasoning in overruling its own precedent in order to justify
the Regulation." Id. As noted, a reviewing court must "hold
unlawful and set aside agency action" that is "arbitrary" or
"capricious." 5 U.S.C. 706(2)(a).
Beverly's inadequate-reasons contention is also without
merit, as the Board amply stated its reasons for revising the
regulation. The Board stated that it was revising the regulation
in order to improve "the role that [Board ALJs] play in
facilitating the expeditious resolution of unfair labor practice
proceedings." 59 Fed. Reg. 46,375 (Sept. 8, 1994). It offered
this regulation as "part of its ongoing review of ways in which
unfair labor practice proceedings can be revamped to move the cases
more expeditiously." Id. at 46,376. Further, the Board addressed
the concerns expressed in comments submitted in response to the
proposed regulations: the Board stated that the benefits provided
through allowing ALJs to issue bench decisions would outweigh the
delays that might arise "in the few cases where the procedure is
improvidently utilized." Id. at 65,943. Additionally, the Board
explained that it was consciously overruling the two cases relied
on by Beverly, because those cases were "based on a misreading of
the requirements of Section 10(c) of the Act." Id. at 65,943-44. 
The Board also pointed to another intervening case where it had
upheld an oral decision by a judge. See Jumbo Produce, 294 NLRB
998, 998-99 (1989) (noting that, in Plumbers, Local 195, "the judge
orally granted the Respondent's motion for summary dismissal
stating only that the General Counsel had failed to establish a
prima facie case. In contrast, the judge here states on the record
his reasons for finding Rivas not to be an agent of the
Respondent."), enforced without opinion, 931 F.2d 887 (4th Cir.
1991).
We therefore have no difficulty upholding this procedural
regulation: it is within the Board's authority and permissible
under the Act. The Board considered relevant precedent, discussed
the objections raised through the comments submitted, and clearly
articulated its reasoning in revising the regulations. Therefore
the Board did not act arbitrarily or capriciously in revising the
challenged regulation. The question becomes whether the Board
complied, as it must, with its own regulation. See Service v.
Dulles, 354 U.S. 363 (1957) (recognizing the right of federal
courts to review an agency's actions to ensure that its own
regulations have been followed); Sampson v. Murray, 415 U.S. 61, 71
(1974) (stating that "federal courts do have authority to review
the claim of a discharged governmental employee that the agency
effectuating the discharge has not followed administrative
regulations"); see also Webster v. Doe, 486 U.S. 592, 602 n.7
(1988).
B. Compliance With the Regulation
Beverly contends that the ALJ's decision to forego
written briefs and to issue an oral bench decision violated the
NLRB regulation for two reasons: first, the ALJ notified the
parties of his decision in an untimely manner, failing to give
Beverly adequate notice of his decision to follow that procedure;
and second, the circumstances of this case are not appropriate for
the invocation of the regulation's oral decision.
The latter issue is easily disposed of. Beverly cites
the regulation's statement of circumstances where oral argument in
lieu of briefs would be appropriate: "a case that turns on a very
straightforward credibility issue; cases involving one-day
hearings; cases involving a well-settled legal issue where there is
no dispute as to the facts; short record single-issue cases; or
cases in which a party defaults by not appearing at the hearing." See 59 Fed. Reg. at 46,376. Beverly also finds "significant[]" a
passage noting "that in more complex cases, including cases with
lengthy records, these procedures would likely not be appropriate." 
Resp't Br. at 22 (quoting 59 Fed. Reg. at 65,943). Beverly's
argument is unavailing. This two-day hearing is more akin to a
"one-day hearing[]" than it is to a "case[] with [a] lengthy
record[]." Most of the legal issues here are "well-settled," and
it became clear as the hearing progressed that the factual disputes
evaporated one by one, either non-existent in the first place or
not genuinely contested. While at the outset the case appeared as
if it might be "complex," the reality as the evidence came in was
that the case presented a few rather straightforward applications
of settled principles of labor law. Thus, while initially the ALJ
properly left open the possibility that the case might be complex
enough to require written briefs, he acted well within his
discretion in determining, as the evidence developed, that the case
was in fact an appropriate candidate for oral arguments in lieu of
briefs.
It must be noted, too, that Beverly is incorrectly trying
to limit the Board to the specific circumstances mentioned in the
regulation. Those examples were merely illustrative. The Board's
Notice of Proposed Rulemaking explicitly stated that "[t]he Board
has not tried to spell out, in the proposed rules, the
circumstances in which these procedures should be utilized." 59
Fed. Reg. at 46,376. Instead, the Board stated that it would
monitor the implementation of the regulation and "refine the
circumstances for which the procedures are best suited." Id. 
Thus, while the regulation sets forth "example[s]" of situations in
which ALJs might opt to issue bench decisions without briefing, it
does not require that such a practice must, or that it may not, be
followed in any particular set of circumstances. The regulation
explicitly leaves ALJs with discretion in deciding whether written
briefs should be permitted or dispensed with, and whether a bench
decision should be issued in any given case. The ALJ here
exercised his discretion in conformity with the Board's regulation.
We turn to the question of the ALJ's timing in notifying
the parties of his discretionary decision. The ALJ notified the
parties that he would hear oral argument in lieu of briefs during
a recess on the afternoon of the second day of the hearing. 
Beverly claims this violates the regulation's requirement that the
ALJ "notify the parties at the opening of the hearing or as soon
thereafter as practicable." See 29 C.F.R. 102.42. In some
cases, no doubt, it will be clear at the outset that written briefs
would not be necessary, and the ALJ would therefore have to so
notify the parties at the opening of the hearing. In other cases,
such as the present one, however, this will not be clear at the
outset, and the ALJ will have to hear some evidence in order to get
a feel for whether the issues are indeed complex enough to require
written briefing, or, alternatively, simple enough for him to
exercise his discretion to dispense with such briefing. 
After hearing the evidence, the ALJ must notify the
parties "as soon . . . as practicable" whether he will dispense
with briefing. Here, the ALJ heard two days worth of evidence
covering each of the three alleged unfair labor practices in
question, and decided at that point to dispense with written
briefs. The question is whether this was the earliest time that
was practicable. 
We are concerned about the timing, in that the hearing
was all but over when the ALJ notified the parties of his decision. 
This, on its face, seems contrary to the intent of the regulation
requiring notice "at the opening of the hearing or as soon
thereafter as practicable." The close of the hearing is as far
from the opening as one could get. On the other hand, this timing
may be a perfectly reasonable application of the regulation to the
circumstances of this case. The union alleged three unfair labor
practices, and Beverly contested all three on the facts. Such
contested issues could be complex enough to fall outside the
boundaries circumscribed by the regulation for oral disposition. 
But if, after hearing the evidence, it appeared that there were no
genuine factual issues in dispute, then the three issues could be
reduced to the simple situation contemplated by the regulation 
situations involving well-settled legal issues where the facts are
not genuinely in dispute and written briefs would be unnecessary.
We cannot say that the ALJ abused his discretion in so
concluding, and in notifying the parties after hearing the bulk of
the evidence in the case. We say this with due deference to the
expertise in labor matters possessed by the ALJ and the Board that
adopted his decision; we also note that the ALJ was the trier of
fact who was closest to the evidence and the facts. 
Nor did notice at such a late time prejudice Beverly
materially. Counsel was given until the following morning before
he had to present his closing argument. Such time is considered
more than sufficient for attorneys to prepare closing arguments in
trials and evidentiary hearings in courts and agencies throughout
the country, including hearings lasting substantially more than the
two days that was the case here. Moreover, the ALJ, after stating
his decision for the record, directly asked both parties whether he
had failed to address and resolve any element of the complaint. At
that time, Beverly's counsel stated that he did not believe there
were any remaining unresolved issues, aside from remedy. 
Conclusion
The Board's order is ENFORCED.